2013-1584

# United States Court of Appeals
# for the Federal Circuit

WALKER DIGITAL, LLC,

*Plaintiff-Appellant*

*v.*

MICROSOFT CORPORATION
and GOOGLE INCORPORATED

*Defendants-Appellees.*

*Appeal from the United States District Court for the District of Delaware*
*Case No. 11-CV-311-RGA, Judge Richard G. Andrews*

## OPENING BRIEF OF APPELLANT WALKER DIGITAL, LLC

Marc A. Fenster
Benjamin T. Wang
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
(310) 826-7474
mfenster@raklaw.com
bwang@raklaw.com

*Attorneys for Appellant*
*Walker Digital, LLC*

Dated: February 10, 2014

<h1 style="text-align:center"><u>CERTIFICATE OF INTEREST</u></h1>

Counsel for Plaintiff-Appellant Walker Digital, LLC certifies the following:

1.     The full name of every party or amicus represented by counsel: Walker Digital, LLC.

2.     The name of the real party in interest represented by counsel: Inventor Holdings, LLC.

3.     The parent corporations of Inventor Holdings LLC, which each own or beneficially own more than 10 percent of the stock of Inventor Holdings, LLC, are Patent Properties, Inc. and Walker Digital LLC.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by counsel in the trial court or agency or are expected to appear in this court are:

<u>Russ August & Kabat</u>
Benjamin T. Wang
Marc A. Fenster
Jacob R. Buczko

<u>Bayard, P.A.</u>
Richard D. Kirk
Stephen B. Brauerman
Vanessa R. Tiradentes

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF RELATED CASES ................................................... iv

I.    JURISDICTION ............................................................................ 1

II.   STATEMENT OF THE ISSUES ................................................... 1

III.   STATEMENT OF THE CASE ...................................................... 1

IV.  STATEMENT OF FACTS ............................................................ 3

     A.  The '802 Patent ................................................................ 3

     B.  The Prosecution History ................................................... 6

     C.  The Extrinsic Record ........................................................ 9

     D.  Proceedings ....................................................................... 9

V.   SUMMARY OF ARGUMENT ..................................................... 12

V.   STANDARD OF REVIEW ........................................................... 15

VII. ARGUMENT ............................................................................... 15

     A.  "Auction" should be construed exactly how the patentees defined the term. .................................................... 15

     B.  The patentees' express definition of "auction" is consistent with the claim language. .......................................... 16

     C.  The specification discloses no "manifest exclusion" of auctions consisting of multiple sales. ................................ 18

     D.  Nothing in the prosecution history excluded multiple sales from the term "auction." ............................................ 20

     E.  The plain and ordinary meaning of "auction" does not limit auctions to "one sale." ............................................ 23

F.  The District Court's construction improperly adds a limitation to what is otherwise the plain and ordinary meaning of the term "auction." .................................................................................................24

VIII. CONCLUSION ............................................................................................26

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Advanced Cardiovascular Sys. v. Scimed Life Sys.*,
   261 F.3d 1329 (Fed. Cir. 2001) ................................................................25

*Baldwin Graphics Systems, Inc. v. Siebert, Inc.*,
   512 F. 3d 1338 (Fed. Cir. 2008) ..............................................................16

*CVI/Beta Ventures v. Custom Optical Frames*,
   1996 U.S. App. LEXIS 14763 (Fed. Cir. June 19, 1996) ....................25

*Cybor Corp. v. FAS Techs, Inc.*,
   138 F.3d 1448 (Fed. Cir. 1998) (*en banc*)..........................................15

*Epistar Corp. v. ITC*,
   566 F.3d 1321 (Fed. Cir. 2009) ................................................................14

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*,
   991 F.2d 768 (Fed. Cir. 1993) ..................................................................25

*Marquip, Inc. v. Fosber Am.*,
   1998 U.S. App. LEXIS 10200 (Fed. Cir. May 19, 1998) ....................25

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) ................................................................15

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................23

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998) ................................................................25

*Retractable Techs., Inc. v. Becton*,
   653 F.3d 1296 (Fed. Cir. 2011) ................................................................25

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ..................................................... 13, 25

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) ............................................................22

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................... 12, 15


**Statutes**

28 U.S.C. § 1295(a)(1) ...............................................................................1

28 U.S.C. § 1338(a) ...................................................................................1


**Rules**

Fed. Cir. R. 47.5 ...................................................................................... iv

Fed. R. Civ. Pro. 11 ............................................................................. 9, 10


**Other Authorities**

Oxford English Dictionary (2011) ...................................................... 9, 23

The American Heritage Dictionary ..................................................... 9, 23

Webster's II New College Dictionary ................................................. 9, 23

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Walker Digital, LLC states that there has been no prior appeal in this case and that there are no related cases pending in this Court or any other court.

## I.   JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1338(a).  The District Court entered final judgment in favor of Defendant-Appellees Google Inc. ("Google") and Microsoft Corp. ("Microsoft") (collectively, "Appellees") on July 23, 2013, and July 25, 2013, respectively.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II.   STATEMENT OF THE ISSUES

Whether the claim term "auction" is limited to an auction of "one sale," even though the patentees' express definition stated simply that: "An auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process."  Exh. D at 4:46-48 (A67).  The District Court limited the claim term "auction" to "[a]n auction consist[ing] of one sale," and based on that construction, entered final judgments of no infringement as to the Appellees.

## III.   STATEMENT OF THE CASE

This in an appeal of final judgments of no infringement in favor of Appellees Google and Microsoft, respectively entered on July 23, 2013, and July 25, 2013, in the District Court of Delaware.  Exhs. B & C (A7-11). Those final judgments were based on the District Court's May 22, 2013, *Markman* Order, limiting the term "auction" to auctions consisting only of "one sale." *Id*.

This is a patent infringement case in which Walker Digital, LLC ("Walker Digital" or "Appellant") accused Google and Microsoft of infringing U.S. Patent 7,801,802 (the "'802 patent"), titled "Method, System and Computer Program Product for Facilitating an Auction Behavior and Automatic Bidding in an Auction."  Walker Digital asserts no other patents or causes of action in this case. Appellees' counterclaims have been dismissed without prejudice. *Id*.

Walker Digital filed its complaint against Appellees on April 11, 2011.  On June 7, 2012, the District Court ordered that the parties submit an accelerated schedule for claim construction of the term "auction" and no more than 2 other terms.  The parties agreed to brief and submit to the District Court for early construction only the term "auction."  A463; A473.  On November 13, 2012, the District Court heard oral argument on the parties' proposed constructions. The parties agreed on the construction of the term in large part with the exception of an additional limitation proposed by Appellees (underlined in the excerpt below):

| Walker Digital's proposal: | "A public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." |
|---|---|
| Appellees' proposal: | "A public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process.  An auction means a single auction, consisting of a single sale." |

*See*, A465.

The District Court issued its *Markman* Order on May 22, 2013, which construed "auction" as "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process. An auction consists of one sale." Exh. A at 2 (A2). Shortly thereafter, Walker Digital stipulated to judgments of no infringement by Microsoft and Google under the District Court's construction of "auction." The District Court entered the stipulated judgment in favor of Google on July 23, 2013, whereby the parties agreed that "[i]n view of the Court's construction of the term 'auction,' Walker Digital concedes that the Accused Products cannot infringe literally or by equivalents, any of the Asserted Claims." Exh. B at 3 (A9). Then, on July 25, 2013, the District Court entered final judgment in favor of Microsoft, stating judgment was "on the basis that Microsoft's Accused Products do not infringe any of the Asserted Claims … in view of the Court's construction of the term 'auction.'" Exh. C (A11). Walker Digital filed its Notice of Appeal in the District Court on August 22, 2013. A988.

## IV. STATEMENT OF FACTS

### A. The '802 Patent

The '802 patent, titled Method, System and Computer Program Product For Facilitating An Auction Behavior And Automating Bidding In An Auction," claims priority to September 2, 1999. The patent is directed to an automated bidding system for auctions that "control[s] the placement of bids using rules

3

associated with desired auction behaviors." Exh. D at 2:3-7 (A66). The patent describes a "rule application engine" and "bid generator," which work together to automatically determine when to apply rules and then ensure that an associated bid is placed. *Id*. at 15:25-35, 16:27-37 (A73). The inventions relate to the rule and bidding aspects of auctions, and they are meant to apply generally to the "many kinds of auctions" that are "held in many different ways." *Id*. at 1:25, 4:47-50 (A66-67).

The patent consists of three independent claims. Independent Claims 1 and 11 are provided in full, as examples, below (the disputed term in bold):

> 1. A method comprising:
> [a] storing a rule for automatically placing a bid by a bid generator for an item for a bidder in an **auction**, the rule associated with the bidder and having a condition specifying that the bid is to be placed by the bid generator according to an amount of time left in the **auction**;
> [b] determining that the rule is satisfied;
> determining that the highest bid in the **auction** is not from the bidder; and
> [c] placing the bid.

*Id*. at 15:26-35 (A73).

> 11. A system, comprising:
> [a] a rule application engine having an output indicative of when to automatically place a bid in an **auction** according to a rule associated with a bidder and having a condition specifying that the bid is to be placed according to an amount of time left in the **auction**; and
> [b] a bid generator, having an input for receiving the rule associated with the bidder and having an output configured for providing, when the rule is satisfied, an indication of the bid

according to the condition if a highest bid in the **auction** is not from the bidder.

*Id*. at 16:27-37 (A73).

"Auction" is expressly defined in the '802 patent: "<u>An auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process</u>." Ex. D at 4:46-48 (A67) (emphasis added).

Absent from the patent is any reference to the claimed "auction" being limited to "one sale" as construed by the District Court. The phrase "one sale" appears nowhere in the patent or file history for the patent.

Throughout the patent, the term "auction" is used in a broad manner. The "Background" section of the patent explains that "[a]uctions for items may be held in <u>many different ways</u> …" *Id*. at 1:25 (A66) (emphasis added). The specification goes on to emphasize that "[t]here are <u>many kinds of auctions</u> which differ in the manner in which bids are submitted and in the manner in which a bid is selected by the seller." *Id*. at 4:48-50 (emphasis added). In addition, in the Background of the Invention, the patent specifically references the "online auction … described in U.S. Patent No. 5,835,896 to Fisher et al.," [*id*. at 1:34-35 (A66)], which itself discloses auctions of "var[ious] … formats," including auctions not limited to "one sale," but instead consisting of "hundreds or even thousands of individual items":

> ABSTRACT…the system closes the auction from further bidding and notifies the winning <u>bidders</u> and losers as to the auction outcome."
> A989 (emphasis added).

* * *

"A variety of auction formats can be employed …. And finally, the method and system of the present invention can be conducted automatically without the need for a human auctioneer, thereby allowing for a large number of items to be continuously auctioned." A1003 at 4:23-29 (emphasis added).

* * *

"Indeed, it would not be possible to operate an equivalent twenty-four hour per day seven day per week auction with potentially hundreds or even thousands of individual items and millions of potential bidders without such an inventive electronic auction method and system." A1004 at 5:22-27 (emphasis added).

## B.     The Prosecution History

The prosecution history for the '802 patent is extensive, covering interactions between the Patent Office and the patentees arising out of the original provisional application, the parent application, and the application that ultimately issued as the '802 patent.  Throughout that extensive history, the patentees and examiner considered numerous prior art references that disclosed auctions not limited to "one sale."  Yet not once did the patentee or examiner distinguish the inventions described in the '802 patent on the basis that the claimed "auction" was limited to "one sale."  Rather, the prosecution history reflects the patentees' and examiners' broad interpretation of the term "auction."

The provisional patent application to which the '802 patent claims priority, for example, describes multiple items being sold in an "auction":

> "Items will be more likely to sell at a higher price because the bidding
> in the auction will be done in accordance with the rules that may help
> stimulate bidding at opportune moments."

A420 (emphasis added).

Similarly, the prosecution history of the parent application, U.S. Patent Application 09/523,653, which is incorporated by reference in the '802 patent, demonstrates that the patentees were aware of and understood "auction" to include auctions of multiple sales. *See*, Exh. D, p. 1 (A48). In discussing a prior art reference to Rupp, the patentees addressed auctions involving multiple items and lots, and, hence, auctions not limited to "one sale." The patentees specifically discussed the disclosure in Rupp of "a typical auction [where] bids are made against lots," and "bidders must submit actual unit prices for all line items within a lot, [and] competition in an auction is based on the aggregate value bid for lots." A605.

Nor were the patentees alone in their understanding of "auction" as including an auction of more that "one sale." The patent examiner for the parent application specifically cited references that disclose auctions involving "multiple lots." The examiner cited U.S. Patent 6,230,146 to Alaia, *et al.*, as "pertinent to applicant's disclosure," and referenced Alaia's disclosure of "electronic auctions involving multiple lots and rules." A618. The examiner also cited related U.S.

Patent 6,499,018 to Alaia, *et al.*, which again describes "electronic auctions with

… multiple lots." A612.

And in the immediate prosecution history of the '802 patent, the patentees

relied on U.S. Patent 6,044,363 to Mori, explaining that <u>Mori</u> disclosed an

"auction" involving multiple sales. A568-9; *see also* A598 at 16:38-42 ("[a]n

auction … comprising [a] number of product purchases"), A595 at 10:57-62

("products are allocated among purchasing persons …. If there are remaining

products, the processing proceeds …."), A592 at 3:8-9 ("Until all auction issues

are sold or a fixed price is reached, such processing is repeated."), A595 at 9:28-33

("[t]he auction monitor includes … a remaining number of products"), A597 at

14:6-15:40 (describing an auction of 200 boxes, 60 of which are sold to A, 80 to C,

and 60 to D), A599 at 17:44-18:11 ("conducting an auction … until all available

products are exhausted"). In particular, the patentees described <u>Mori</u> as follows:

> In the specific example illustrated by <u>Mori</u>, a supplier has 200 boxes
> of flower bulbs …. Several interested bidders for the bulbs, including
> "m-mori" (who is willing to purchase at least 50 boxes up to 80 boxes
> …), are entered into an automatic auction…. Where there is only one
> bidder, the auction ends and that bidder receives the amount of
> product she specified for that price (for example, 60 boxes at 95 yen
> …). If there is product left over (in this example, there are now 140
> boxes left because 200-60= 140 boxes), the auction begins again ….
> If a competitive state occurs … , then the price is incrementally
> increased … and products are allocated to winning bidders ( … a
> bidder obtains the next 80 boxes, so that 60 boxes then remain to be
> auctioned off).

A568-9.

Nowhere did the patentees distinguish their view of "auction" from the multiple sales auctions of <u>Fisher</u>, <u>Rupp</u>, <u>Alaia</u>, or <u>Mori</u>.

## C.   The Extrinsic Record

The extrinsic record reflects an understanding of "auction" beyond simply an auction of "one sale." Contemporaneous dictionaries, for instance, define the term in near identical manner to the '802 patent's express definition. Webster's II New College Dictionary (1995) defines "auction" as "[a] public sale in which property or items of merchandise are sold to the highest bidder." A539. The American Heritage Dictionary (1979) defines auction in the exact same manner. A543. The Oxford English Dictionary (1993) defines "auction" as "[a] (usu. public) sale in which articles are sold to or reserved for the highest bidder," which also tracks how the patentees used the term. A547. And even today, the term "auction" has the same commonly understood meaning. A549 (Oxford English Dictionary (2011) ("a public sale in which goods or property are sold to the highest bidder.").

## D.   The District Court Proceedings

Walker Digital filed its original complaints against Google and Microsoft on April 11, 2011. A74. Thereafter, Google filed a motion seeking sanctions against Walker Digital under Rule 11 of the Federal Rules of Civil Procedure. A105. Google argued that an "auction" consisting of multiple sales was "contrary to any

understanding of an auction in which we are aware." A217. This was contrary to Appellee Microsoft's own documentation, which describes "multi-item auctions …, such as the auction of online ads for search terms and content pages on … Google." A1148. Google subsequently retreated from its claim, admitting that "it is true that the word 'auction' in isolation can refer to something broader than a single sale in certain contexts…" A474.

The Court denied Google's Rule 11 motion, but directed the parties to propose an accelerated schedule for claim construction of the term "auction" and no more than 2 other terms." A362. Google then notified Walker Digital that the only term needing construction in the accelerated *Markman* was "auction." A624.

The parties briefed their respective proposed constructions of "auction," agreeing that the construction should include the specification's express definition of the term: "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." Appellees, however, proposed augmenting that express definition by limiting it to "a single auction, consisting of a single sale." In other words, they sought to carve-out and exclude auctions consisting of multiple sales even though the definition contained in the specification had no such limitation.

The accelerated *Markman* hearing took place, on November 13, 2012, before Judge Andrews of the District Court of Delaware. At the hearing, Appellees

explained that they "do have only one dispute here.  And it's whether auction, and it's as claimed in the '802 patent, can contain multiple sales."  A1084 (Hearing Tr. at 6:9-12).

The parties subsequently proposed and briefed additional claim terms for construction as part of the normal case schedule, and the District Court held a second *Markman* hearing on May 16, 2013.

The District Court issued its combined *Markman* ruling on May 22, 2013, construing "auction" from the accelerated hearing as well as the additional terms argued during the May 2013 hearing. *See*, Exh. A (A1).  Walker Digital did not appeal the District Court's construction of terms other than "auction."  The District Court construed "auction" to mean "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process.  An auction consists of one sale."  As a result of that construction, Walker Digital stipulated to judgment of no infringement.  The District Court entered the stipulated judgment in favor of Google on July 23, 2013, whereby the parties agreed that "[i]n view of the Court's construction of the term 'auction' Walker Digital concedes that the Accused Products cannot infringe literally or by equivalents, any of the Asserted Claims." Exh. B at 3 (A9).  The District Court then, on July 25, 2013, entered final judgment in favor of Microsoft, stating judgment was "on the basis that Microsoft's Accused Products do not infringe any of the Asserted Claims of U.S.

Patent No. 7,801,802 in view of the Court's construction of the term 'auction.'" Exh. C (A11). This appeal followed.

## V.     SUMMARY OF ARGUMENT

The sole issue on appeal is whether it was error to limit the express definition of the term "auction" in the '802 patent to an auction of only "one sale," where both the intrinsic and extrinsic record demonstrate that the term "auction" was used in a broad manner irrespective of the number of sales in the "auction." Because the District Court narrowed the scope of the term "auction" without evidence that the patentees manifestly excluded auctions of more than "one sale," Appellant respectfully requests that this Court reverse the judgments of no infringement and remand with the term "auction" construed as expressly defined by the patentees: "A public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." Ex. D at 4:46-48 (A67).

The meaning of "auction" is readily apparent because the specification – "the single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) – is unambiguous. Without any additional limitations, the specification expressly provides that "[a]n auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." Exh. D at 4:46-48 (A67). Nowhere do the

claims, specification, or file history condition that express definition to auctions consisting only of "one sale," as the District Court found.

From the intrinsic record, it is clear that the patentees understood that auctions may include one sale or many sales. Indeed, the claim language is indifferent to the number of sales in the claimed "auction." Exh. D, Claims 1, 6 and 11 (A73). Instead, the claims describe methods and systems for placing bids in an auction, specifying rules that turn on considerations of time and bid amount. *Id.* But those rules apply just the same regardless of whether the auction consists of one sale or many sales.

Moreover, even assuming that there might be auctions of multiple sales where time and highest bid conditions "might" not "function as intended," as found by the District Court, the existence of such auctions means only that those auctions would not infringe, not that the term "auction" should be limited to only "one sale." The District Court's analysis did not recognize this distinction and its analysis suggests that it concluded that the "method of claim 1 [must] function as intended" for all types of auctions. *See*, Exh. A at 2 (A2). The District Court's analysis should instead have consisted of determining whether the record included a "manifest exclusion or restriction," limiting "auctions" to only "one sale." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012). But here, there was no such evidence.

Indeed, the evidence is to the contrary. The specification and prosecution history specifically refer to auctions consisting of multiple sales. The specification refers to U.S. Patent 5,835,896 to Fisher, which describes multi-sale auctions. And during the prosecution of the '802 patent, the patentees and the examiner referred to prior art references to <u>Rupp</u>, <u>Alaia</u>, and <u>Mori</u>, all of which disclose auctions of multiple sales, and which were not distinguished on that basis.

Moreover, the express definition of "auction" and the patentees' understanding of "auction" as encompassing auctions of multiple sales are consistent with the ordinary meaning of "auction." Contemporaneous dictionaries provide nearly verbatim definitions without the "one sale" limitation required by the District Court.

There is a "heavy presumption that claim terms carry their full ordinary and customary meaning …." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). Here, the patentees expressly defined the term "auction" consistent with its broad ordinary meaning, and without any manifested intent to limit auctions to only "one sale." The District Court's construction and the final judgments of no infringement that resulted should, therefore, be reversed.

## VI.   STANDARD OF REVIEW

The Federal Circuit addresses claim construction as a matter of law, which the Court reviews de novo and without deference on appeal. *See Cybor Corp. v. FAS Techs, Inc*., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*).

## VII.   ARGUMENT

The District Court erred in construing the term "auction" in the '802 patent beyond how the term was expressly defined by the patentees, and as a result, the final judgments of no infringement should be reversed.

### A.   "Auction" should be construed exactly how the patentees defined the term.

The specification clearly and unambiguously provides that:

"An auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process. There are many kinds of auctions which differ in the manner in which bids are submitted and in the manner in which a bid is selected by the seller."

Exh. D at 4:46-50 (A67) (emphasis added). The specification's clear definition and explanation alone should end the Court's inquiry. "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) (emphasis added); *see also Vitronics Corp.*, 90 F.3d at 1582 ("[T]he specification

is always highly relevant …. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

### B. The patentees' express definition of "auction" is consistent with the claim language.

The claims do not use the term "auction" in a manner that restricts its express definition to "one sale." Claim 1, for instance, includes limitations for "placing a bid by a bid generator for an item … in an auction," a "condition specifying that the bid is to be placed … according to an amount of time left in the auction," and "determining that the highest bid in the auction is not from the bidder." Exh. D, Claim 1 (A73). Certainly none of those limitations expressly limits an auction to an auction of "one sale." And in common patent parlance, "an" item refers to one or more items. *See*, *Baldwin Graphics Systems, Inc*. v. *Siebert, Inc*., 512 F. 3d 1338, 1344 (Fed. Cir. 2008)

The District Court, however, reached a different conclusion, reasoning that, if "auction" included multiple sales, "[t]he method of claim 1 would not function as intended because the bid generator bids according to the time left in the 'auction.'" Exh. A at 2-3 (A2-3). The District Court explained that in an auction of multiple sales, the "bid generator might attempt to bid for an item or lot in a sale that was already over." *Id*. But nothing in the actual claim language requires that the bid actually result in the bidder winning the item on which she bid. A system

practicing the method of claim 1 may place the bid, and that bid may be unsuccessful for whatever reason, including that the item was already won, but that does not suggest that the term "auction" must be limited to "one sale." Indeed, the specification explains that the "auction server" can reject bids that "do[] not comply with the auction rules." Exh. D at 11:48-49 (A71). If a bidder attempts to bid on an item that has already sold, the auction server may simply reject or change the bid.

But even if the District Court's analysis – that there may be instances where claim 1 would not function as intended because an item may have already sold at the time the bid generator attempted to place the bid – was correct, that analysis overlooks differences between the claims. Claim 11, for instance, requires only that the "bid generator" provide an "indication of the bid," as opposed to Claim 1's "placing the bid." Exh. D, *cf.* Claim 1 *with* Claim 11 (A73). In other words, the District Court's narrowing of the claim scope based on a "functional" analysis has no application to Claim 11 because the claim would not require a bid being placed for an item that has already sold.

Regardless, there is no "functional" difficulty inherent to a multiple sale auction in the context of the claims of the '802 patent. A multiple sale auction consisting of multiple lots of tulips, as in the <u>Mori</u> prior art reference, functions with the time conditions of the claims of the '802 patent. For example, using

<u>Mori</u>, a bidder in an auction of tulips may apply rules restricting her bid to a specific time, and if she is the highest bidder at that time, she would have won the number of tulips for which she bid.  The auction, however, would continue for any remaining tulips.  A bidder placing a bid with one minute left in the auction (the example provided by the District Court) would still be bidding on tulips, assuming any lots remained at that time.

Nor does the parties' agreed construction of the "highest bid" limitation suggest that the patentees used the term "auction" to mean only "one sale."  Again, using the <u>Mori</u> prior art reference as an example, a bidder's bid for tulips may be the highest bid at a specific time and result in the bidder winning 60 boxes of tulips, but the auction would continue for the remaining boxes of tulips.  A568-9.  And, in any event, the parties' agreed construction for a term cannot work to rewrite the patentees' express definition of "auction," which included no limitation on the number of sales in the auction.

### C. The specification discloses no "manifest exclusion" of auctions consisting of multiple sales.

The specification (the "single best guide to the meaning of a disputed term") contains no manifest exclusion of auctions consisting of multiple sales.  The specification repeatedly refers to auctions in which multiple goods or services are auctioned.  The express definition of "auction" itself provides that "[a]n auction is a public or private sale in which <u>goods or services</u> [(plural)] of a seller may be sold

to a bidder through a bidding process." Exh. D at 4:46-48 (A67) (emphasis added).

The specification further discloses that entries in the database of seller information

"are made and updated <u>as sellers register items</u> to be auctioned …." *Id.* at 8:23-25

(A69) (emphasis added); *see also id.* at 8:36-40 ("Entries in [the bidder] database

are made and updated <u>as sellers register items for auction</u> …." (emphasis added)).

In other words, for any particular "auction" a seller may have registered multiple

"items for auction." Figure 5 is an example of one such auction. It discloses the

following multiple items up for auction: (a) karaoke machine; (b) tapes; and (c)

sheet music - 80's rock, easy listening favorites. *See* Exh. D, Fig. 5 (A54)

excerpted below.



| ITEM IDENTIFIER 504 | ITEM DESCRIPTION 506 | ITEM CATEGORY 508 | SELLING PRICE 510 | BEHAVIOR IDENTIFIER 512 |
|---|---|---|---|---|
| I-1234 | PLATINUM & PEARL DINNER RING CIRCA 1920 | JEWELRY | N/A | B-B9765 |
| I-2345 | GLASS ROOSTER - PRE CIVIL WAR, 16" GREEN, YELLOW AND RED | ANIMAL FIGURINES | $70.00 | B-B8080 |
| I-3456 | ROLLER SKATES, 1928 - GOOD CONDITION, AUTHENTICATED. | ANTIQUE SPORTING EQUIPMENT | N/A | B-B7777 |
| I-4567 | TURN OF THE CENTURY PIE HUTCH - BEEN IN ONE FAMILY FOR 100 YEARS!! MUST SELL | ANTIQUE FURNISHINGS | $140.00 | B-B9862 |
| I-5678 | KARAOKE MACHINE PLUS TAPES, SHEET MUSIC - 80'S ROCK, EASY LISTENING FAVORITES | MUSICAL DEVICES | N/A | B-B2222 |

FIG. 5

Indeed, the specification emphasizes that "[a]uctions for items may be held

in many different ways …." Exh. D. at 1: 25 (A66). One such way, described in

U.S. Patent No. 5,835,896 to Fisher, *et al.*, which the patentees' referenced in the

"Background" section of the patent, discloses a multi-sale "online auction with a proxy bidder." In particular, <u>Fisher</u> describes:

- "[W]inning <u>bidders</u> and losers as to the auction outcome." A989 (emphasis added).

- "A variety of auction formats … depending on the type of merchandise being sold. And … <u>allowing for a large number of items to be continuously auctioned</u>." A1003 at 4:23-29 (emphasis added).

- "Indeed, it would not be possible to operate <u>an equivalent twenty-four hour per day seven day per week auction with potentially hundreds or even thousands of individual items</u> and millions of potential bidders without such an inventive electronic auction method and system." A1004 at 5:22-27 (emphasis added).

### D. Nothing in the prosecution history excluded multiple sales from the term "auction."

The prosecution history reveals that the patentees understood auctions to include multiple sales, and never distinguished their invention as being limited to auctions of "one sale." In responding to the Patent Office, the patentees' addressed a prior art reference to <u>Mori</u>, explaining that <u>Mori</u> disclosed an "auction" involving multiple sales of differing amounts of the auctioned item. A598; *see also* A598 at 16:38-42 ("[a]n auction … comprising [a] number of product purchases"), A595 at 10:57-62 ("products are allocated among purchasing persons …. If there are remaining products, the processing proceeds …."), A592 at 3:8-9 ("Until all auction issues are sold or a fixed price is reached, such processing is repeated."), A595 at 9:28-33 ("[t]he auction monitor includes … a remaining number of

products"), A597 at 14:6-15:40 (describing an auction of 200 boxes, 60 of which are sold to A, 80 to C, and 60 to D), A599 at 17:44-18:11 ("conducting an auction … until all available products are exhausted") (emphases added).  In particular, the patentees described <u>Mori</u> as follows:

> In the specific example illustrated by <u>Mori</u>, a supplier has 200 boxes of flower bulbs ….  Several interested bidders for the bulbs, including "m-mori" (who is willing to purchase at least 50 boxes up to 80 boxes …), are entered into an automatic auction….  Where there is only one bidder, the auction ends and that bidder receives the amount of product she specified for that price (for example, 60 boxes at 95 yen …).  If there is product left over (in this example, there are now 140 boxes left because 200-60= 140 boxes), the auction begins again ….  If a competitive state occurs … , then the price is incrementally increased … and products are allocated to winning bidders ( … a bidder obtains the next 80 boxes, so that 60 boxes then remain to be auctioned off).

A568-9.  The patentees did not distinguish their view of "auction" from the multiple sales auction of <u>Mori</u>.  Instead, they distinguished <u>Mori</u> on the ground that it did not disclose conditions/rules as addressed by the '802 patent.  *Id.* at 10.

The patentees' broad view of "auction" is consistent throughout the intrinsic record.  The prosecution history for the parent application of the '802 patent clearly reveals that the patentees' were aware of and understood "auction" to extend beyond an auction of "one sale."  In discussing a prior art reference to <u>Rupp</u>, the patentees addressed auctions involving multiple items and multiple lots, and, hence, auctions not limited to a "single sale."  The patentees specifically

referred to the disclosure in <u>Rupp</u> of "a typical auction [where] <u>bids are made</u> <u>against lots</u>," and "bidders must submit actual unit prices for <u>all line items within a</u> <u>lot</u>, [and] competition in an auction is based on the aggregate value <u>bid for lots</u>." A605 (emphasis added).

The examiner of the parent application also specifically cited to auctions involving "multiple lots." For example, the examiner cited U.S. Patent 6,499,018 to Alaia, *et al.*, which discloses "electronic auctions with … multiple lots" as "pertinent to applicant's disclosure." A612. The examiner also cited related U.S. Patent 6,230,146 to Alaia, *et al.*, which discloses "electronic auctions involving multiple lots and rules" as "pertinent to applicant's disclosure." A618.

The <u>Fisher</u>, <u>Mori</u>, <u>Rupp</u>, and <u>Alaia</u> prior art references are relevant for what they reveal about the scope of an "auction" at the relevant time period. *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (recognizing that prior art cited during prosecution "sheds light on the meaning of a term [and] can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.")

The District Court's construction of "auction" as being limited to "one sale" is inconsistent with the intrinsic record as a whole, which contains no clear disavowal of claim scope. To the contrary, the specification uses "auction" in a

broad manner, acknowledging that "[t]here are many kinds of auctions …." Exh. D, at 4:48-50 (A67).

### E. The plain and ordinary meaning of "auction" does not limit auctions to "one sale."

Construing the term "auction" consistent with the patentees' express definition, and without the added limitation of "one sale," is consistent with the plain and ordinary meaning of the term. "One sale," or similar terms, are not included in the Oxford English Dictionaries, Webster's II New College Dictionary, or The American Heritage Dictionary, all of which, as discussed above, are nearly identical to the patentees' express definition. "Dictionaries … are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation. A dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005) (Appellant adds emphasis). The absence of any reference to "one sale," or similar terms, in the dictionaries confirms that the limitation is not part of the commonly understood meaning of "auction." And nowhere in the record did Appellees identify any dictionary definition of "auction" limiting the term to "one sale."

Moreover, real-world auctions commonly include multiple sales. For instance, over the course of an entire day in 1999 (the same year that the '802

patent derives from), the Christie's Auction House held the "Eric Clapton Christie's Guitar Auction." A551. That "auction" consisted of "a sale of 100 … guitars, plus several amplifiers and … [g]uitar [s]traps." *Id.* More recently, Christie's held an auction for "The Collection of Elizabeth Taylor," and "The London Sale," and Julien's Auctions held an auction for "the Collection of Michael Jackson." A558, A560 & A621. Each of those auctions consisted of multiple sales of multiple items. *Id.* In fact, although called a "sale" (singular), "The London Sale" is an "auction" "[c]omprising a total of 167 lots …." A621. Google's own use of the term "auction" confirms this ordinary use. A563 (providing as an example of the use of the term "auction": "his <u>collection</u> is to be auctioned off tomorrow" (emphasis added)).

### F. The District Court's construction improperly adds a limitation to what is otherwise the plain and ordinary meaning of the term "auction."

The District Court's addition of a "one sale" limitation improperly adds a limitation to what is otherwise clear language – a limitation that is found nowhere in the intrinsic or extrinsic record. The fact that the phrase "one sale" appears nowhere in the actual claims, patent, prosecution history of the patent, or related patents and their prosecution histories is compelling evidence that the District Court's construction is improper. The absence of any "one sale" reference undermines the notion that "the specification … contain[s] 'expressions of

manifest exclusion or restriction, representing a clear disavowal'" of "auction" as more than "a single auction, consisting of a single sale." *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (emphasis added).

This Court has routinely rejected attempts to import terms that appear nowhere in the record. *E.g., Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 261 F.3d 1329, 1340-1341 (Fed. Cir. 2001) (rejecting limitation because "nowhere in the prosecution history did the inventors indicate that their invention, in general, required [the limitation]"); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1252 (Fed. Cir. 1998) (rejecting "limitation [that] appears nowhere in the claims"); *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771 (Fed. Cir. 1993) (rejecting construction because "[t]here is no 'separate and apart' limitation in the claims; that phrase appears nowhere in the … patent"); *Marquip, Inc. v. Fosber Am.*, 1998 U.S. App. LEXIS 10200, *6 (Fed. Cir. May 19, 1998) (reversing construction because "[a]lthough the district court reads the claim to include 'physically identifiable,' those terms appear nowhere in the claim"); *CVI/Beta Ventures v. Custom Optical Frames*, 1996 U.S. App. LEXIS 14763, *6 (Fed. Cir. June 19, 1996) (rejecting limitation that appeared "[n]owhere in the specification, claims, or prosecution history"). Nothing in the record supports the District Court's departure from this rule.

As this Court emphasized in *Thorner*, "[courts] do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and

unmistakable disclaimer." *Thorner*, 669 F.3d at 1366-67 (Fed. Cir. 2012). Here, however, the patentees did not clearly or unmistakably disclaim auctions that may include multiple sales.

## VIII. CONCLUSION

Construing the term "auction" as limited to "one sale" departs from patentees' express definition of the term as well its ordinary meaning. An auction that may consist of multiple sales is consistent with the structure and operation of the claims. Simply put, there is no reasonable basis under the facts or the law to exclude auctions consisting of multiple sales from patentee's express definition of auction. Walker Digital, therefore, respectfully requests that the Court reverse the District Court's construction in favor of Walker Digital's construction, reverse the judgments of non-infringement, and remand for proceedings consistent such ruling.

Respectfully submitted,

February 10, 2014

/s/ *Marc A. Fenster*
Marc A. Fenster
Benjamin T. Wang
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard 12th Floor
Los Angeles, California 90025
Telephone: 310/826-7474
Facsimile: 310/826-6991
mfenster@raklaw.com
bwang@raklaw.com

Attorneys for Appellant
Walker Digital, LLC

26

CASE PARTICIPANTS ONLY

# ADDENDUM

# ADDENDUM
## TABLE OF CONTENTS

|   | Date | ECF No. | Title | Page No. |
|---|------|---------|-------|----------|
| A | 05/22/13 | 155 | Claim Construction Order | A1 |
| B | 07/23/13 | 174 | Stipulation and Final Judgment of Non-infringement | A7 |
| C | 07/25/13 | 176 | Final Judgment of No Infringement by Microsoft Corporation | A11 |
| D | -- | -- | U.S. Patent No. 7,801,802 | A48 |

CASE PARTICIPANTS ONLY

**A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WALKER DIGITAL, LLC,                    :
                                        :
          Plaintiff,                    :
                                        :
     v.                                 :          Civil Action No. 11-311-RGA
                                        :
GOOGLE, INC., YAHOO! INC., and,         :
MICROSOFT CORPORATION,                  :
                                        :
          Defendants.                   :

## CLAIM CONSTRUCTION ORDER

The parties having briefed their positions on construction of the claims of United States

Patent No. 7,801,802 (the "'802 patent"), and the Court having conducted *Markman* hearings on

November 13, 2012 and May 16, 2013, it is hereby ordered that, as used in the '802 patent, the terms

below are construed as follows:

## I.    AGREED UPON TERMS

The parties agreed upon the constructions of certain terms of the '802 patent, and the Court

accepts them as set forth below for the purposes of this litigation.

| Claim Term | Agreed Upon Construction |
|---|---|
| "bid" | An offer from or on behalf of a bidder that includes an offered price for the good or service being auctioned |
| "the highest bid in the auction is not from the bidder" | the highest offer received for the item is not from the bidder |

| "determin[ing] that the rule is satisfied; determin[ing] that the highest bid in the auction is not from the bidder; and plac[ing] the bid" | "determining" steps must be performed before "placing" step |
|---|---|

## II.   DISPUTED TERMS

The parties have disputed the constructions of certain other terms of the '802 patent. The Court adopts the following constructions of those terms:

1.   The term "auction" is construed to mean "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process. An auction consists of one sale." The term must be construed in the context of the claims. The three independent claims of the '802 patent each contain a "time remaining limitation." For example, claim 1 sets forth:

> A method comprising:
>
> storing a rule for automatically placing a bid by a bid generator for an item for a bidder in an auction, the rule associated with the bidder and having a condition specifying that the bid is to be placed by the bid generator according to an amount of time left in the auction;
>
> determining that the rule is satisfied;
>
> determining that the highest bid in the auction is not from the bidder; and
>
> placing the bid.

('802 patent at col.15 ll.26-35).

Under plaintiff's proposed construction, an auction could consist of multiple sales. The method of claim 1 would not function as intended because the bid generator bids according to the

2

A2

time remaining in the "auction." If the "auction" involved multiple sales that ended at different times, the bid generator might attempt to bid for an item or lot in a sale that was already over. For example, assume that the bidder wished to bid for the item or lot in the first sale of the "auction" and that the bid generator was set to bid with one minute left in the "auction." If the bid generator did not place the bid until there was one minute remaining in the multi-sale "auction," the sale of the first item would have already ended when the proxy bidder attempted to place the bid.

The three independent claims of the '802 patent also contain a "highest bid" limitation. (*Id.*). The parties have agreed to construe the term "the highest bid in the auction is not from the bidder" as "the highest offer received for the item is not from the bidder." (D.I. 116-2). The parties, therefore, agree that, in the context of the highest bid, the bid must be for the particular item being sold in that auction. Claims must be interpreted consistently so the term "time left in the auction" must likewise be interpreted as the time remaining to place bids for the item. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

The '802 patent's specification supports the Court's construction. The specification lists the information necessary to process a bid: the auction, the bidder and the bid price. ('802 patent at col.4 ll.62-63).[1] If the auction could include multiple sales of multiple items, the proxy bidder would require more information to place a bid because it would not be able to determine on which item the bidder wishes to bid. In addition, Figures 3 through 8, which describe the databases that manage the auctions and bidding, and the accompanying text, treat each item as a single auction.

---

[1]     The specification at this point is using "auction" synonymously with "single sale."

Plaintiff's argument for its construction is principally that the patent expressly defines "auction." (D.I. 91 at 9-10). "An auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." (*Id.* at col.4 ll.46-48). Plaintiff argues that the definition thus expressly includes multiple sales because of the use of "goods and services." Plaintiff's argument fails, not only because it is inconsistent with the way "auction" is used in the claims and in the specification, but because one sale can include multiple goods and/or services. Thus, there is nothing about the use of the phrase "goods and services" that indicates how "auction" should be construed.[2]

2.      The term "amount of time left in an auction" does not require construction. Plaintiff argued that no construction of this term is necessary. Defendants Google and Microsoft agreed that the term did not require construction if the Court adopted their proposed construction of "auction," limiting that term to a single sale. (D.I. 133 at 13 n.1). Having adopted (in essence) the defendants' proposed construction of the term "auction," the Court concludes that the term "amount of time left in an auction" does not require construction.

3.      The term "bid generator" is construed to mean "a computer program or part of a computer program that bids for a bidder in amounts above the initial price or another bidder's bid." The Court's construction is consistent with the definition of "bid generator" set forth in the '802 patent, which incorporates by reference the definition of "proxy bidder" set forth in the '119 provisional application. '802 patent col.1 ll.15-18. The parties dispute whether there must be

---

[2]      In common English usage (as plaintiff's citations to dictionary definitions makes clear), auction can mean either a "sale" or the event at which multiple sales take place. The invention is clearly directed to the former and not the latter.

4

A4

multiple bidders or whether the proxy bidder referenced in the patent can be the sole bidder. The Court concludes that the '802 patent does not require that there be "another bidder's bid" and that the proxy bidder could place the first bid, based either on the seller's floor price or the bidder's initial price.[3]

4.      Claims 6, 7, and 9 are not means-plus-function claims pursuant to 35 U.S.C. § 112(f). The term "means" is not used in claims 6, 7, or 9 and, therefore, a "strong" presumption arises that these claims are not means-plus-function claims. *See Lighting World v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("Our cases make clear . . . that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."). Google and Microsoft have failed to overcome this presumption. The Court, therefore, declines to construe these terms as means-plus-function claims. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 877 F. Supp. 2d 838, 896-97 (N.D. Cal. 2012) (preliminary injunction) (declining to construe claim terms as means-plus-function claims), *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012); *Versata Software, Inc. v. Sun Microsystems, Inc.*, 2008 WL 3914098, at *13-14 (E.D. Tex. Aug. 19, 2008) (same).[4]

---

[3]      The '119 provisional application's definition of "proxy bidder" does not expressly limit the proxy bidder from placing the first bid.

[4]      The Court acknowledges the defendants' oral argument based on this month's decision in *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 2013 WL 1920941 (Fed. Cir. May 10, 2013) (en banc). The defendants may raise a § 101 argument at the appropriate time.

A5

Entered this 22nd day of May, 2013.

_____

Hon. Richard G. Andrews
United States District Judge

A6

CASE PARTICIPANTS ONLY

**B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WALKER DIGITAL, LLC,                    )
                                        )
      Plaintiff,                     )
                                        )
v.                                      )  C.A. No. 11-311-RGA
                                        )
GOOGLE INC. AND MICROSOFT               )
CORPORATION,                            )
                                        )
      Defendants.                    )

## STIPULATION AND FINAL JUDGMENT OF NONINFRINGEMENT

Plaintiff Walker Digital, LLC ("Walker Digital") and Defendant Google Inc. ("Google")
state as follows:

WHEREAS Walker Digital filed suit against Google on April 11, 2011, alleging that
Google infringes U.S. Patent No. 7,801,802 ("the '802 patent");

WHEREAS Google denied infringement and counterclaimed for invalidity of the '802
patent;

WHEREAS the Court held a claim construction hearing on the term "auction" on
November 13, 2012;

WHEREAS Walker Digital served infringement contentions on December 21, 2012,
accusing Google's AdWords and AdSense systems, and related systems, and all versions thereof
since the issuance of the patent-in-suit;

WHEREAS the Court held a claim construction hearing on the remaining disputed terms
on May 16, 2013;

WHEREAS the Court issued an order construing all the disputed claim terms (D. I. 155);

A7

WHEREAS Google announced the product "Open Bidder" at the Google I/O 2013 conference on May 20, 2013;

WHEREAS each party wishes to preserve for appeal all challenges, if any, that the respective party may have to some or all of the Court's claim constructions; and

WHEREAS, in order to conserve judicial and party resources, the parties wish to stipulate to non-infringement of the asserted claims of the '802 patent in light of the Court's claim construction of "auction."

THEREFORE, Walker Digital and Google, by their undersigned counsel, hereby stipulate and agree, subject to the approval of the Court, as follows:

1.      Walker Digital asserts claims 1, 2, 4, 6, 7, 9, 11, 12, 14 of the '802 patent (the "Asserted Claims") against Google in this litigation.

2.      Each of the Asserted Claims include the disputed claim term "auction."

3.      The Court construed the term "auction" to mean "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process.  An auction consists of one sale."

4.      In its Infringement Contentions served on December 12, 2011, Walker Digital asserts that Google's AdWords and AdSense systems, and related systems, and all versions thereof since the issuance of the patent-in-suit (the "Accused Products") infringe the Asserted Claims.

5.      Sufficient facts about the Accused Products have been established in the record at least at D.I. 38-47, 82, 91-92, 96, 116, 118-119, 121, 133-134, 153, 165, 170, 172, and the November 13, 2012 hearing transcript.

A8

6.      It is agreed that Google's Open Bidder product announced on May 20, 2013, is not an Accused Product and that Walker Digital will not file a complaint asserting the '802 patent against the Open Bidder product, if at all, until this case is remanded to the Court if the Court's construction of the term "auction" is reversed on appeal, or after the completion of this lawsuit.  Google reserves all rights and defenses with respect to the Open Bidder product.

7.      In view of the Court's construction of the term "auction" Walker Digital concedes that the Accused Products cannot infringe literally or by equivalents, any of the Asserted Claims.

8.      Google's counterclaims filed against Walker Digital in this action shall be dismissed without prejudice.  Google reserves all rights in its counterclaims and defenses.

9.      If this matter is not disposed of on appeal, the parties reserve all rights to appeal as to the proper construction and application of any or all of the remaining claim terms construed in the Court's claim construction order to which they object and which are not the subject of this stipulation.  The parties expressly agree that they will not move to dismiss or otherwise oppose the right to appeal the construction or application of any or all of the remaining claim terms after final judgment if this matter is remanded for further proceedings.

10.     Based on the above stipulation of non-infringement, the Parties stipulate to entry of final judgment that the Accused Products do not infringe any of the Asserted Claims, without prejudice to the parties' rights to appeal the Court's claim construction order.

11.     This Stipulation and Final Judgment is without prejudice to the parties' right to appeal any future orders issued by the Court and is without prejudice to any claim for attorneys' fees and/or costs under any basis, including without limitation Rule 11, Rule 54(d), and §285.  All issues relating to fees and costs are reserved pending the outcome of any appeals,

3

A9

and the deadlines for filing such motions shall be set by the Court after a ruling by the Court of

Appeals.

12.      Google reserves all rights to assert any additional grounds of non-

infringement and invalidity of all of the claims of the '802 patent in the event that the appellate

court remands the case to the District Court or refuses to hear the merits of the appeal.

July 19, 2013

Of Counsel:

Marc A. Fenster
Benjamin T. Wang
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard 12th Floor
Los Angeles, California 90025
(310) 826-7474
mfenster@raklaw.com
bwang@raklaw.com

BAYARD, P.A.

*/s/ Richard D. Kirk*
Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
Vanessa R. Tiradentes (vt5398)
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com
*Attorneys for Plaintiff Walker Digital, LLC*

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Michael J. Malecek
Timothy Chao
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 319-4500

*/s/ Richard L. Horwitz*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Google Inc.*

SO ORDERED, this 23rd day of July, 2013.

Ruland G. Andrews
United States District Judge

4

A10

CASE PARTICIPANTS ONLY

**C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WALKER DIGITAL, LLC,

      Plaintiff,

    v.

GOOGLE INC., *et al.*,

      Defendants.

C.A. No. 11-311 (RGA)

## [~~PROPOSED~~] FINAL JUDGMENT OF NO INFRINGEMENT BY MICROSOFT CORPORATION

WHEREAS Walker Digital, LLC and Microsoft Corporation have stipulated to no infringement by Microsoft Corporation in the STIPULATION REGARDING FINAL JUDGMENT OF NO INFRINGEMENT BY MICROSOFT CORPORATION for reasons specified therein;

IT IS HEREBY ORDERED:

Judgment is hereby entered in favor of Microsoft Corporation and against Walker Digital, LLC on Walker Digital's claims of infringement, on the basis that Microsoft's Accused Products do not infringe any of the Asserted Claims of U.S. Patent No. 7,801,802 in view of the Court's construction of the term "auction." Microsoft Corporation's counterclaims filed against Walker Digital, LLC in this action are hereby dismissed without prejudice.

Signed this 25th day of July, 2013.

*Richard G. Andrews*
United States District Judge

A11

CASE PARTICIPANTS ONLY Document: 42 Page: 50 Filed: 02/10/2014

**D**



US007801802B2

(12) **United States Patent**
Walker et al.

(10) Patent No.: **US 7,801,802 B2**
(45) Date of Patent: **Sep. 21, 2010**

(54) **METHOD, SYSTEM AND COMPUTER PROGRAM PRODUCT FOR FACILITATING AN AUCTION BEHAVIOR AND AUTOMATIC BIDDING IN AN AUCTION**

(75) Inventors: **Jay S. Walker**, Ridgefield, CT (US); **Daniel E. Tedesco**, New Canaan, CT (US); **Kathleen Van Luchene**, Norwalk, CT (US); **James A. Jorasch**, Stamford, CT (US); **Adam Ware**, Scarsdale, NY (US)

(73) Assignee: **Walker Digital, LLC**, Stamford, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 227 days.

(21) Appl. No.: **11/423,827**

(22) Filed: **Jun. 13, 2006**

(65) **Prior Publication Data**
US 2006/0224497 A1 Oct. 5, 2006

**Related U.S. Application Data**

(62) Division of application No. 09/523,653, filed on Mar. 10, 2000, now abandoned.

(60) Provisional application No. 60/152,119, filed on Sep. 2, 1999.

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)

(52) **U.S. Cl.** .................................................. 705/37

(58) **Field of Classification Search** ................... 705/37, 705/1, 36
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,789,928 A 12/1988 Fujisaki

| | | | |
|---|---|---|---|
| 4,799,156 A | | 1/1989 | Shavit et al. |
| 4,881,178 A | * | 11/1989 | Holland et al. ................ 706/12 |
| 5,253,165 A | | 10/1993 | Lriseca et al. |
| 5,270,921 A | | 12/1993 | Hornick |
| 5,634,055 A | | 5/1997 | Barnewall et al. |
| 5,758,328 A | | 5/1998 | Giovannoli |

(Continued)

OTHER PUBLICATIONS

Guasch, J. Luis and Glaessner, Thomas; "The how and why of credit auctions"; Mar. 1993; Finance & Development, v30, n1; pp. 1-5.*

(Continued)

*Primary Examiner*—Ella Colbert
(74) *Attorney, Agent, or Firm*—Fincham Downs, LLC

(57) **ABSTRACT**

One or more proxy bidders is associated with a rule which determines a time to place a bid. The proxy bidder places a bid at the determined time, instead of immediately after the bidder's prior bid is exceeded. Such rules may be selected for all proxy bidders to encourage a desired auction behavior. By controlling the placement of bids based on rules associated with the desired auction behavior, bids may be placed in a manner that seems natural and competitive to bidders in the auction when, in fact, they are placed in accordance with the selected rules. The desired auction behavior may be selected statically for an auction or dynamically during the auction. Historical auction data may be analyzed to characterize the behavior of an auction, such as the average period of time between bids and the average increment between bids. Rules may be generated to correspond to a behavior so as to provide the same average time and increment between bids.

**15 Claims, 16 Drawing Sheets**



A48

## US 7,801,802 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,778,367 A | * | 7/1998 | Wesinger et al. ............. 707/10 |
| 5,794,207 A | | 8/1998 | Walker et al. |
| 5,826,244 A | | 10/1998 | Huberman |
| 5,835,896 A | | 11/1998 | Fisher et al. |
| 5,839,114 A | | 11/1998 | Lynch et al. |
| 5,873,071 A | | 2/1999 | Ferstenberg et al. |
| 5,890,138 A | | 3/1999 | Godin et al. |
| 5,897,620 A | | 4/1999 | Walker et al. |
| 5,905,975 A | | 5/1999 | Ausubel |
| 6,012,045 A | | 1/2000 | Barzilai et al. |
| 6,044,363 A | * | 3/2000 | Mori et al. ................... 705/37 |
| 6,047,274 A | * | 4/2000 | Johnson et al. ............. 705/412 |
| 6,055,518 A | | 4/2000 | Franklin et al. |
| 6,131,087 A | * | 10/2000 | Luke et al. .................... 705/26 |
| 6,151,589 A | | 11/2000 | Aggarwal et al. |
| 6,230,146 B1 | | 5/2001 | Alaia et al. |
| 6,499,018 B1 | | 12/2002 | Alaia et al. |
| 6,560,580 B1 | | 5/2003 | Fraser et al. |
| 6,609,112 B1 | * | 8/2003 | Boarman et al. ............. 705/37 |
| 6,629,082 B1 | | 9/2003 | Hambrecht et al. |
| 6,647,373 B1 | * | 11/2003 | Carlton-Foss ............... 705/37 |
| 6,704,713 B1 | * | 3/2004 | Brett .......................... 705/37 |
| 7,003,485 B1 | * | 2/2006 | Young ......................... 705/37 |
| 7,330,826 B1 | | 2/2008 | Porat et al. |
| 2001/0027431 A1 | * | 10/2001 | Rupp et al. ................... 705/37 |
| 2008/0162331 A1 | | 7/2008 | Ephrati et al. |

### OTHER PUBLICATIONS

David Lucking-Reiley; "Auctions on the Internet: What's Being Auctioned, and How?"; Aug. 14, 1999;pp. 1-51.*

Ulrich Kamecke; "Dominance or maximin: How to solve an English Acuction"; Int. J Game Theory; May 1995; pp. 407-426.*

Ulrich Kamecke; "Dominance or maximin: How to solve an English Acuction"; Int. J Game Theory; May 1995; pp. 407-426.*

Timothy Gassen; "Robby the Robot would marvel at how he is sold"; Arizona Daily Star; Feb. 22, 1999; Abstract. pp. 1 and 2.*

Trout, Robert R.; "A Market-based Method for Relicensing Federal Hydroelectic Sites"; Public Utilities Fortnightly; Jan. 19. 1984; vol. 113, Issue 2; pp. 1 and 2.*

Bid Maker, The Covenient way to win, www.onsale.com/tools/bidmaker.htm, Down load Date: Jun. 8, 1999, 9 pp.

American Airlines Internet Silent Auction: Rules for American airlines Silent Auction, www.webmaster@americanair.com, Jun. 30, 1996, 12 pp.

Ebay: Proxy Bidding, www.pages.ebay.com/aw/help/help-t-bid-prxy.html, Download Date: Jun. 9, 1999, 4 pp.

Auction Works: About CompuBid, www.auctionworks.com/compubid.html, Download Date: Jun. 4, 1999, 2 pp.

Travel Facts Auction: Frequently asked Questions, www.bid4travel.com/faq.htm#.compubid, Download date Jun. 4, 1999, 8 pp.

Emaze Auction, www.emaze.com/auction.cfm, Download Date: Jun. 19, 1999, 5 pp.

OpenSite Auction software: Corporate 40, www.opensite.com/products/software/corporate.html, Download Date: Jun. 19, 1999, 2 pp.

"The Growth of Pricing: Key Profit Center", Professional Pricing Society, 10th anniversary spring Pricing Conference, Orlando, FL, www.pricing-advisor.com/conf agn.html, Download Date Jun. 19, 1999, 10 pp.

BoxLot Online Action: Review Auction & Bidding Formats, www.boxlot.com/formats.html, Download Date: Sep. 22, 1999.5 pp.

Oberndorf, "Information Highway Robbery; Brief Article", Catalog Age, Dec. 1, 1998, No. 13, vol. 15; p. 59, 2 pp.

Interactive Public Relations & Marketing News: News Briefs, Jun. 26, 1998, vol. 5, No. 13, 2 pp.

"Emaze Software Releases Cold Fusion-Based Auction Program", PR Newswire, Aug. 18, 1998, 2 pp.

DiDio, "Airmax Management Package Keeps Vacant Seats to Minimim", Computerworld-Corporate Strategies, p. 29, 2 pp.

Feldman, "Reclaiming Control; New Software to Close Gap Between Projected and Actual Revenues", Air Transport World, Aug. 1995, vol. 32; No. 8; p. 35, 5 pp.

Feldman, "Pricing and Cybersales; Internet Airline Ticket Sales and Reservations", Air Transport World, Feb. 1998, No. 2; vol. 35; p. 64, 4 pp.

Solomon Brothers' Maldutis says Internet is Aviations's "Third Revolution," Will Earn Billions, World Airline News, Mar. 21, 1997, vol. 7, No. 12, 2 pp.

Adyanthaya, "Revenue Management, The Black Art", Interavia Business & Technology, Sep. 1998, No. 623; vol. 53; p. 43, 4 pp.

Ubid Online Auction: Ubid Help Pages, www.ubid.com/help/auctions_bidbutler.asp, Download Date: Jun. 8, 1999, 2 pp.

Amazon.com Auction Help: Bidder's Guide, www.auctions.amazon.com/exec/varzea/ts/help/bidding-by-proxy/002-0187463-5892847, Download Date: Jun. 8, 1999, 3 pp.

DiDio, Laura, "Airmax Management Package Keeps Vacant Seats To A Minimum", Computerworld, Sep. 14, 1998, 2 pp.

Yu, Jinkeum, Ph.D., "Essays on Collusive Behavior in Auctions", May 1998, 166 pp.

Roth, Alvin E. and Ockenfels, Axel, "Last-Minute Bidding and the Rules for Ending Second-Price Auctions: Evidence from Ebay and Amazon Auctions on the Internet", 1998, American Economic Review, 19 pp.

Hendrick, Kenneth, Porter, Robert H. And Boudreau, Bryan, "Information, Returns and Bidding Behavior in OCS Auctions 1954-1969", The Journal of Industrial Economics, Jun. 1987, 26 pp.

Bodington, Jeff, "Bidding Behavior", Independent Energy, Oct. 1997, 3 pp.

Office Action for U.S. Appl. No. 09/523,653 mailed Sep. 10,2007, 18 pp.

Office Action for U.S. Appl. No. 09/523,653 mailed Nov. 3, 2006, 18 pp.

Office Action for U.S. Appl. No. 09/523,653 mailed Feb. 13, 2006, 16 pp.

Office Action for U.S. Appl. No. 09/523,653 mailed Feb. 13, 2006, 9 pp.

Office Action for U.S. Appl. No. 11/423,821 mailed Jan. 7, 2010, 16 pp.

Office Action for U.S. Appl. No. 11/423,821 mailed Jun. 2, 2009, 13 pp.

Office Action for U.S. Appl. No. 11/423,821 mailed Aug. 26,2008, 16 pp.

Office Action for U.S. Appl. No. 11/423,821 mailed Sep. 10, 2007, 12 pp.

Office Action for U.S. Appl. No. 11/423,834 mailed Jul. 7, 2009, 13 pp.

Office Action for U.S. Appl. No. 11/423,834 mailed Nov. 5, 2008, 10 pp.

Office Action for U.S. Appl. No. 11/423,834 mailed Apr. 4, 2008, 6 pp.

* cited by examiner

Case: 13-1584 CASE PARTICIPANTS ONLY Document: 42 Page: 53 Filed: 02/10/2014



FIG. 1

200
CLOCK
206
PROCESSOR
204
COMMUNICATION PORT
202
BIDDER DATABASE
210
SELLER DATABASE
212
ITEM DATABASE
214
208
RULES DATABASE
216
PROXY BID DATABASE
218
CURRENT AUCTION DATABASE
220
PROGRAM
222

FIG. 2

300

| BIDDER IDENTIFIER 304 | NAME 306 | MAILING ADDRESS 308 | E-MAIL ADDRESS 310 | PAYMENT IDENTIFIER 312 |
|---|---|---|---|---|
| 58675 | KATIE VAN LIGHTIN | 1061 CAMINO DE LA CRUZ SANTA FE, NM 87501 | KTVL@ GRNOLA.NET | 1111-2222-3333-4444 |
| 68876 | MAGGIE BOLD | P.O. BOX 2000 GREEN ACHRES, VA 21210 | MAGS@ SHOTGUN.COM | 2222-3333-4444-5555 |
| 78677 | TED DESK | 32 CHURCH ST. BLANCHE, CT 06707 | TDESK@ YAHOO.COM | 3333-4444-5555-6666 |
| 88678 | JAMES GERONIMO | 1327 SCENIC DR. PALO ALTO, CA 93432 | JAMESG@ AOL.COM | 4444-5555-6666-7777 |

302

FIG. 3

400

FIG. 4

| SELLER IDENTIFIER 404 | SELLER NAME 406 | EMAIL ADDRESS 408 | PAYMENT IDENTIFIER 410 | ASSOCIATED ITEM IDENTIFIERS 412 |
|---|---|---|---|---|
| S-9999 | SARAH JONES | DEE@ AL.COM | 9999-8888-7777-6666 | I-1234 |
| S-8888 | LYNN GODDARD | LG@ CKE.COM | 8888-7777-6666-5555 | I-3456; I-9898; I-0099 |
| S-7777 | STEVE TUDOR | ST@ US.COM | 7777-6666-5555-4444 | I-5699; I-8787 |
| S-6666 | TIMOTHY BOR | TIMB@ POMP.COM | 6666-5555-4444-3333 | I-2424 |

402

A53

500

| ITEM IDENTIFIER 504 | ITEM DESCRIPTION 506 | ITEM CATEGORY 508 | SELLING PRICE 510 | BEHAVIOR IDENTIFIER 512 |
|---|---|---|---|---|
| I-1234 | PLATINUM & PEARL DINNER RING CIRCA 1920 | JEWELRY | N/A | B-B9765 |
| I-2345 | GLASS ROOSTER - PRE CIVIL WAR, 18" GREEN, YELLOW AND RED | ANIMAL FIGURINES | $70.00 | B-B8080 |
| I-3456 | ROLLER SKATES, 1928 - GOOD CONDITION, AUTHENTICATED. | ANTIQUE SPORTING EQUIPMENT | N/A | B-B7777 |
| I-4567 | TURN OF THE CENTURY PIE HUTCH - BEEN IN ONE FAMILY FOR 100 YEARS!! MUST SELL | ANTIQUE FURNISHINGS | $140.00 | B-B9862 |
| I-5678 | KARAOKE MACHINE PLUS TAPES, SHEET MUSIC - 80'S ROCK, EASY LISTENING FAVORITES | MUSICAL DEVICES | N/A | B-B2222 |

502

FIG. 5

600

| BEHAVIOR IDENTIFIER 604 | RULE IDENTIFIER 606 | BEHAVIOR 608 | RULE DESCRIPTION 610 |
|---|---|---|---|
| B-B1234 | R-111 | CONSISTENT, WITH AVERAGE FREQUENCY EVERY 2-5 MINUTES | PLACE BID TWO MINUTES AFTER PREVIOUS WINNING BID IS RECEIVED |
| B-B3456 | R-222 | CONSISTENT, WITH AVERAGE FREQUENCY EVERY 2-5 MINUTES | PLACE BID 3 MINUTES AFTER PREVIOUS WINNING BID IS RECEIVED |
| B-B8888 | R-333 | INCREASE FREQUENCY AS AUCTION BECOMES COMPETITIVE | IF AVERAGE BIDDING SPEED INCREASES BY 15%, INCREASE BID PLACEMENT SPEED BY 10% |
| B-B9765 | R-444 | CONSISTENT, WITH FREQUENCY EVERY 20-50 MINUTES | PLACE BID 45 MINUTES AFTER PREVIOUS WINNING BID IS RECEIVED |
| B-B8080 | R-555 | DELAY OF AT LEAST FIVE MINUTES AFTER EVERY 1-3 BIDS | PLACE BID FIVE MINUTES AFTER EVERY THREE BIDS ARE RECEIVED |

602

**FIG. 6**

— 700

| BIDDER IDENTIFIER 704 | ITEM IDENTIFIER 706 | RULE IDENTIFIER 708 | BID CEILING 710 |
|---|---|---|---|
| 58675 | I-1234 | R-444 | $70.00 |
| 58675 | I-3339 | R-777 | $48.00 |
| 98245 | I-4848 | R-999 | $54.00 |
| 48652 | I-5678 | R-898 | $150.00 |

702

# FIG. 7



| BIDDER IDENTIFIER 816 | BID AMOUNT 818 | BIDDING TIME 820 | TYPE OF BIDDER 822 |
|---|---|---|---|
| ITEM IDENTIFIER: | I-1234 | | 802 |
| AUCTION START DATE/TIME: | 10/21/99 8:00 A.M. | | 804 |
| AUCTION END DATE/TIME: | 10/23/99 8:00 A.M. | | 806 |
| CURRENT NUMBER OF PARTICIPATING BIDDERS: | 5 | | 808 |
| BID INCREMENT AMOUNT: | $2.00 | | 810 |
| 00009 | $4.00 | 8:15 A.M. | MANUAL |
| 58675 | $6.00 | 9:00 A.M. | PROXY |
| 23232 | $8.00 | 10:00 A.M. | PROXY |
| 99989 | $20.00 | 10:05 A.M. | MANUAL |
| 58675 | $22.00 | 10:50 A.M. | PROXY |

FIG. 8

A57



FIG. 9

Case: 13-1584 Case: PARTICIPANTS ONLY Document 42 Filed: 02/10/2014 Page: 62 Filed: 02/10/2014



FIG. 10



FIG. 11

Case: 13-1584 CASE-PARTICIPANTS ONLY Document: 43 Page: 63 Filed: 02/10/2014



FIG. 12



FIG. 13

Case: 13-1584 CASE PARTICIPANTS ONLY Document: 43 Page: 64 Filed: 02/10/2014



FIG. 14

Case: 13-1584 Case: PARTICIPANTS ONLY Document: 42 Page: 65 Filed: 02/10/2014



FIG. 15

A62



FIG. 16

Case: 13-1584 CASE PARTICIPANTS ONLY Document: 43 Page: 67 Filed: 02/10/2014



**FIG. 17**



FIG. 18

US 7,801,802 B2

1

# METHOD, SYSTEM AND COMPUTER PROGRAM PRODUCT FOR FACILITATING AN AUCTION BEHAVIOR AND AUTOMATIC BIDDING IN AN AUCTION

## CROSS-REFERENCES TO RELATED APPLICATIONS

The present application is a divisional patent application of U.S. patent application Ser. No. 09/523,653, filed Mar. 10, 2000 and now abandoned, entitled "METHOD, SYSTEM AND COMPUTER PROGRAM PRODUCT FOR FACILITATING AN AUCTION BEHAVIOR AND AUTOMATIC BIDDING IN AN AUCTION;"

which claims the benefit of provisional U.S. Patent Application No. 60/152,119 filed Sep. 2, 1999. Each of the above-referenced applications is incorporated by reference herein in its entirety.

This application is related to U.S. patent application Ser. No. 11/423,821, filed on Jun. 13, 2006, and to U.S. patent application Ser. No. 11/423,834 filed on Jun. 13, 2006.

## BACKGROUND

Auctions for items may be held in many different ways. Bidders may be physically present at one location or may be dispersed geographically. Bids may be submitted during a specified time in advance of the auction. Bidders may submit spoken bids, written bids or electronic bids, for example over a computer or other communications network. Using such a network, an auction may be performed entirely online. In an online auction, a bidder may place bids manually or may use a proxy bidder, which places bids automatically on behalf of the bidder. An example of an online auction with a proxy bidder is described in U.S. Pat. No. 5,835,896 to Fisher et al.

Using a conventional proxy bidder, a bidder in an online auction specifies how bids should be placed. Typically, a proxy bidder determines a bid amount and places a bid for the bidder instantly after the proxy bidder detects that the previous bid is surpassed. For example, a proxy bidder may use a maximum desired amount for the item and an increment to add to a previously placed bid. The proxy bidder places bids in the smallest increment needed to exceed the previous bid, until reaching the maximum amount specified by the bidder. In summary, if an auction is performed with proxy bidders, bidding occurs unnaturally, quickly and early.

## SUMMARY

The outcome of an auction, such as price and/or speed at which the item is sold, depends in part on the way that bidders bid for the item. In particular, the behavior of one or more bidders in an auction may influence another bidder's perception of the value of the item. For example, if one or more bidders place bids aggressively (e.g., bids are placed frequently), subsequent bid prices increase significantly), perhaps due to the use of proxy bidders, another bidder's perceived value of the item may be increased. However, proxy bidders may discourage bidders from participating in online auctions by making the bids appear automated and out of human control. Users also may become frustrated from, for example, being outbid instantly and may become discouraged from participation in the auction.

One or more proxy bidders is associated with at least one rule which determines a time to place a bid. The proxy bidder places a bid in accordance with the at least one rule at the determined time, which may be different from the time immediately after the bidder's prior bid is exceeded by another's bid. Such rules may be selected for all proxy bidders in an auction to encourage a desired auction behavior. By controlling the placement of bids using rules associated with the desired auction behavior, bids may be placed in a manner that seems natural and competitive to bidders in the auction even though they are placed in accordance with selected rules. The desired auction behavior may be selected statically for an auction or dynamically before and/or during the auction. In one embodiment, historical auction data, such as the average period of time between bids and the average increment between bids, may be analyzed to characterize the behavior of an auction. Rules may be generated to correspond to a behavior so as to provide the same average time and increment between bids.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a dataflow diagram of an example online auction system;

FIG. 2 is a diagram of an example auction server;

FIG. 3 is a diagram of an example table for a database of bidders;

FIG. 4 is a diagram of an example table for a database of sellers;

FIG. 5 is a diagram of an example table for a database of items;

FIG. 6 is a diagram of an example table for a database of behaviors and associated rules;

FIG. 7 is a diagram of an example table for a database of specifications for proxy bidders;

FIG. 8 is a diagram of an example table for a database of information about an auction;

FIG. 9 is a flowchart describing how an auction is performed in one embodiment;

FIG. 10 is a flowchart describing how an auction may be initialized;

FIG. 11 is a flowchart describing how a desired auction behavior may be determined;

FIG. 12 is a flowchart describing how bidders may be registered for an auction;

FIG. 13 is a flowchart describing how one or more proxy bidders may be created;

FIG. 14 is a flowchart describing how one or more rules may be assigned to each proxy bidder;

FIG. 15 is a flowchart describing how bids for manual and proxy bidders may be processed;

FIG. 16 is a flowchart describing how behavior of an auction may be characterized;

FIG. 17 is a flowchart describing how the rule database may be developed; and

FIG. 18 is a block diagram illustrating a relationship between processes corresponding to the flowchart of FIG. 9 and the databases of FIGS. 2-8, in one embodiment.

## DETAILED DESCRIPTION

In one aspect of the present invention, a method for managing an auction involves specifying an auction behavior, and specifying at least one rule for controlling when a bid may be placed automatically for a bidder according to the specified auction behavior. At least one bid for a bidder may be placed automatically according to the at least one rule and according to at least one specified bidding behavior. If the highest bid in the auction is not from the bidder, the bid may be placed automatically according to the at least one specified bidding behavior at a time according to the at least one rule. The

US 7,801,802 B2

3

specified bidding behavior may be a maximum bid amount and a minimum bid increment. An auction behavior may be specified by determining the auction behavior according to information about the auction, which may include information about an item, information about a seller and/or information about bidders.

The auction behavior may be determined by receiving information about one or more prior auctions, wherein each of the prior auctions has an associated auction behavior, and identifying at least one of the prior auctions as similar to the auction based on the information about the auction and the information about the one or more prior auctions. One or more of the prior auctions identified as similar to the auction then may be selected. The auction behavior associated with the selected one or more prior auctions may be as the auction behavior. At least one of the prior auctions similar to the auction may be identified by comparing information about the auction to the information about the one or more prior auctions using a metric to obtain a measure, and comparing the measure to a threshold defining an extent of similarity. The selected one or more prior auctions may be one which has a best outcome among the at least one of the prior auctions identified as similar to the auction. A best outcome may be a highest price or a fastest sale.

A rule may be specified by associating at least one rule with at least one candidate auction behavior from which the auction behavior is specified, and selecting the at least one rule associated with the specified auction behavior. At least one rule may be associated with each candidate auction behavior by determining at least one rule that corresponds to each candidate auction behavior; and storing the at least one rule in a database. A candidate auction behavior is a behavior of an auction similar to the current auction. At least one rule which corresponds to each candidate auction behavior may be determined by characterizing each candidate auction behavior, and selecting rules corresponding to the candidate auction behavior.

In one embodiment, actual auction behavior may be evaluated according to bids received in the auction. The at least one rule for controlling when a bid may be placed automatically in the auction may be modified according to the actual auction behavior. The actual auction behavior may be evaluated by characterizing the actual auction behavior according to bids received in the auction, and comparing the selected auction behavior to the actual auction behavior. The at least one rule may be modified by selecting at least one alternative rule corresponding to the actual auction behavior, for example, by selecting the at least one alternative rule randomly from among a plurality of rules.

In another aspect, a computer program product includes a computer readable medium with computer program instructions stored thereon, wherein the computer program instructions, when executed by a computer, direct the computer to perform the aforementioned method for managing an auction.

In another aspect, a system for managing an auction identifies an auction behavior, and identifies at least one rule for controlling when a bid may be placed automatically for a bidder in the auction according to the selected auction behavior.

In another aspect, a system for managing an auction includes an auction behavior selector and a rule generator. The auction behavior selector provides an indication of a selected auction behavior. The rule generator has an input for receiving an indication of the selected auction behavior and an output for providing at least one rule for controlling when a bid may be placed automatically for a bidder in the auction

4

to encourage the selected auction behavior. The auction behavior selector may include a comparator and a selector. The comparator has an input for receiving the information about the at least one prior auction and information about the auction, and an output for providing an indication of at least one of the prior auctions similar to the auction. The selector has an input for receiving the indication of one or more of the prior auctions identified as similar to the auction and an output for providing an indication of the auction behavior associated with a selected one or more of the prior auctions.

In another aspect, a method for selecting an auction behavior for an auction, includes receiving information about the auction, and matching the information about the auction to an auction behavior. The information about the auction may be matched to the auction behavior by receiving information about one or more prior auctions, wherein each of the prior auctions has an associated auction behavior. At least one of the prior auctions is identified as similar to the auction using the information about the auction and the information about the one or more prior auctions. One or more of the prior auctions identified as similar to the auction is then selected. The auction behavior associated with the selected one or more prior auctions may be selected as the auction behavior. At least one of the prior auctions may be identified as similar to the auction by comparing information about the auction to the information about the one or more prior auctions using a metric to obtain a measure. This measure may be compared to a threshold defining an extent of similarity. The selected one or more prior auctions may be one that has a best outcome among the at least one of the prior auctions identified as similar to the auction, for example by having a highest price and a fastest sale.

In one embodiment, actual auction behavior may be evaluated according to bids received in the auction. The at least one rule for controlling when a bid may be placed automatically in the auction may be modified according to the actual auction behavior. The actual auction behavior may be evaluated by characterizing the actual auction behavior according to bids received in the auction, and comparing the selected auction behavior to the actual auction behavior. The at least one rule may be modified by selecting at least one alternative rule corresponding to the actual auction behavior, for example, by selecting the at least one alternative rule randomly from among a plurality of rules.

FIG. 1 illustrates an example online auction system for managing an auction. An auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process. There are many kinds of auctions which differ in the manner in which bids are submitted and in the manner in which a bid is selected by the seller.

The online auction system in FIG. 1 includes an auction manager **100** which receives bids **102**, **103** from one or more bidders participating in one or more auctions. A bid is an offer from or on behalf of a bidder, and the bid includes an offered price for the good or service being auctioned. The bid may specify an actual price or an amount relative to some other price, such as a predetermined value greater than a previous bid price. The bids may be received by the auction manager **100** in any of a number of ways, including, but not limited to, any data discernable by the auction manager as a bid, such as a message in any format of any computer communication protocol. To process a bid, the auction server uses an indication of the auction, the bidder and the bid price. A bid from a bidder may itself include any one or more of these pieces of information. Any information that the auction server can infer or derive need not be included in the bid itself. Thus, a bid generally includes an indication of one or more of the auction,

US 7,801,802 B2

5

the bidder and the bid price. The indication of the bidder may be any data indicative of an identifier, such as a name, address, telephone number, email address, security number, credit card number, or other data that can identify the bidder in the system. Automatically and manually generated bids may be received by the auction manager 100. Automatically generated bids may be received from one or more bid generators 114, also referred to herein as proxy bidders, described below.

The auction manager 100 maintains information about current bidding status 104 for each auction. The information about the current bidding status typically includes at least the highest bid price, and optionally an identifier of the highest bidder (the bidder that submitted the high bid, or on whose behalf the high bid was submitted). Information describing a bidding time and/or a type of bidder (e.g., whether manual or automatic) also may be included. Other information about the auction also may be provided, including, but not limited to, an identifier of the item, start and end dates and times of the auction, a number of bidders, and/or a minimum increment amount for a bid to exceed a previous bid. The current bidding status 104 is accessible by both manual and proxy bidders to enable bidders to make another bid. Manual and proxy bidders may access the current bidding status 104 by requesting information from the auction manager 100, or by reading the information from some storage location maintained by the auction manager, or by the auction manager sending the information to the bidder, or in any other manner appropriate given the implementation of the auction manager and/or proxy bidders.

Each bid generator 114 receives data specifying at least part of its bidding behavior. The bidding behavior indicates how the bid generator 114 generates a new bid from a current bid. The data specifying the bidding behavior may, in one embodiment, include a maximum bid price 120 and an increment value 122. The maximum bid price 120 indicates the maximum price which the bidder associated with the proxy bidder is willing to bid for an item. The increment value 122 is the amount by which the bid must exceed a previous bid. The increment value 122 may be defined for all bidders in the auction through the auction server, for example, by an individual or by the auction server itself. Alternatively, the bidder may specify his own increment value to be used by the corresponding bid generator. Any suitable interface, such as an HTML form, may be used to permit a bidder to specify the bidding behavior of the proxy bidder. Using the current bidding status 104, the bid generator generates the bid 102 according to the specified bidding behavior. In general, the bid generator adds the increment value 122 to the bid price of the previous bid to yield the bid price of the new bid. The bid price of the new bid may not exceed the maximum bid 120. If the highest bid price received during the auction exceeds the maximum bid price 120, then no bid is placed and/or the actual bidder is notified in some manner (e.g., using electronic mail) that his maximum bid price has been exceeded.

One or more rules 112 may be applied to determine, for example, when the bid is to be placed. Accordingly, the bid is not necessarily placed immediately after the bid generator 114 detects that a previously submitted bid price has been exceeded by another bidder. A rule applied by the bid generator 114 may be obtained from many sources. A rule may be specified by the bidder, by the auction system, by the seller, or any combination thereof. A rule may be created or may be selected from a predetermined list.

A rule specifies at least one condition (also called an "antecedent" or "predicate") and at least one consequent, which may include an action to be performed. A rule also may have an activator (also called a trigger or event), which causes the

6

bid generator 114 to apply the rule. A rule is applied by determining whether its condition is true. If the condition is determined to be true, the consequent occurs, e.g., the specified action is performed. Typically, the action performed is placing a bid having a bid price that is higher than the current high bid price by a specified increment.

A condition may be specified as, for example, an amount of time that has passed and/or a number of bids that have been submitted. Additionally or alternatively, a condition may be specified using other information about the auction, such as the current price. A trigger similarly may be specified as, for example, an amount of time that has passed and/or a number of bids that have been submitted, or by some other event in the auction, such as an auction server indicating to the proxy bidder that it will accept a bid from the proxy bidder.

Both conditions and triggers may be specified using similar information; however, a condition is evaluated by a proxy bidder, whereas a trigger causes the proxy bidder to apply a rule. The specification of conditions and triggers to define a bidding behavior depends on implementation of the proxy bidder and coordination of information exchange between the auction server and the proxy bidder. Unless otherwise specified herein, therefore, the term condition encompasses triggers, except for triggers that specify only that the most recent bid from the proxy bidder is exceeded by a bid from another bidder or that are only a result of coordination by the auction server of acceptance of bids from proxy bidders.

As noted above, a condition generally may be specified using information about the auction or time or other information to determine when a bid may be placed by the proxy bidder. For example, a condition may be specified by a fixed amount of time or a variable amount of time. The variable amount of time may be a function of, for example but not limited to, the amount of time left in the auction, whether the auction has been extended, the rate at which bids are placed in the auction, or the current price of the item. A condition also may be specified by a fixed number of bids, e.g., one, or a variable number of bids. The variable number of bids may be a function of, for example, the amount of time left in the auction, whether the auction has been extended, the rate at which bids are placed in the auction, or the current high bid price for the item. A condition also may be specified by a ratio between a number of bids and an amount of time, which may be fixed or variable. Conditions also may be specified using any other information about the auction, such as who placed the last bid, number of bidders in the auction, etc.

Some example rules include, but are not limited to, placing a bid:

1. periodically at a predetermined time after a previous bid is placed, e.g., five minutes after a previous bid is placed;

2. periodically at a predetermined time after the auction has begun, e.g., every five minutes starting from one hour after the beginning of the auction;

3. according to a frequency of a predetermined number of previous bids, e.g., if the past five bids have occurred within twenty minutes, the proxy bid is placed within five minutes of the last bid; if the past five bids have occurred within one hour, the proxy bid is placed within fifteen minutes of the last bid;

4. after waiting a random amount of time after a previous bid is placed;

5. according to a bid price achieved by the last bid, e.g., if the high bid price exceeds a predetermined amount, the bid is placed more (or less) quickly;

6. according to an amount of time left in the auction, e.g., the bid is placed more (or less) quickly near the end of the auction;

7. at a predetermined time before the end of auction;

A68

US 7,801,802 B2

7

8. more or less quickly if the auction is going to be extended;

9. after a minimum number of bids is placed previously, e.g., the bid is placed after three other bids have been placed.

Many kinds of rules can be provided, and the invention is not limited to any particular rules. Rules also may be related to bidding by manual bidders. For example, the speed at which manual bids are placed may determine how the proxy bids are placed. Rules also may be specified at the beginning of an auction, but their application may be delayed until a specified action has occurred. One or more rules also may be specified for one or more proxy bidders to facilitate a desired auction behavior. An auction behavior is a manner in which bids in an auction are placed, for example, the times at which they are placed, the frequency with which they are placed, and the amount by which they exceed any previous bid. Generally, a desired auction behavior is an auction behavior that has a likelihood to provide the best beneficial outcome. The desired auction behavior is selected, by the seller, by an auctioneer or automatically, so as to improve or optimize the outcome of the auction, such as price at which and/or speed with which the item is sold, or other beneficial outcome for a party, whether seller, bidder or auctioneer.

An auction behavior selector 106 may be used to select a desired auction behavior 108. For example, the auction behavior selector may use one or more of the current bidding status 104, current information about the current auction 116, and/or information about past auctions 118. For example, the auction behavior selector may identify a prior auction that is most similar to the current auction, and select the auction behavior of that prior auction as the desired auction behavior. Similarity may be determined by comparing one or more values associated with the auctions, using any suitable similarity or distance metric to obtain a measure of similarity. A measure computed using a similarity metric generally increases with increased similarity of the compared items. A measure computed using a distance metric generally decreases with increased similarity of the compared items. Many kinds of metrics may be used, including Hamming distance, correlation, Euclidean distance and other metrics. The invention is not limited by any particular similarity or distance metric. One or more thresholds may be defined to which this measure may be compared to indicate an extent of similarity. An example implementation of an auction behavior selector 106 is described in more detail below.

Given a desired auction behavior, a rule selector 110 may select one or more rules 112, one or more of which may be applied to one or more proxy bidders in the manner described above. In general, the rule generator may associate one or more rules with each auction behavior, and provide an indication of such rules, given the desired auction behavior.

An example implementation of an online auction system will now be described in connection with FIGS. 2-9.

The auction behavior selector 106, auction manager 100, rule generator 110 and one or more bid generators 114 all may be present and operating on one or more computers or other devices acting as a server computer for the auction. This server computer, herein called an auction server, may be accessed by one or more computers or other devices used by sellers, and one or more computers or other devices used by bidders in any manner known in the art (e.g., via the Internet).

The auction server 200 may include one or more communication ports 202, one or more processors 204, an internal data and time clock 206, and storage 208 which includes one or more computer programs 222 defining instructions, which when executed, instruct the computer to perform the operations of the auction behavior selector, rule generator, auction

8

manager and bid generator. The storage also may include a bidder database 210, seller database 212, item database 214, rules database 216, proxy bid database 218 and auction database 220. These programs and these databases will now be described in more detail in connection with FIGS. 3-8.

FIG. 3 illustrates an example table 300 for a bidder database, which includes one or more records 302. In general, each record associates a bidder identifier 304 with a payment identifier 312 and optionally, additional information about the identified bidder. In this example, each record 302 includes a bidder identifier 304, name 306, mailing address 308, email address 310 and payment identifier 312. Entries in this database are made as users register with the auction server as described below. After a bidder registers for an auction for an item, a list corresponding items identifiers also may be stored in this entry for a bidder.

FIG. 4 illustrates an example table 400 for a seller database, which includes one or more records 402. In general, each record associates a seller identifier 404 with one or more associated item identifiers 412 and optionally, additional information about the seller. Example additional information about the seller includes a name 406, an email address 408, and a payment identifier 410. Entries in this database are made and updated as sellers register items to be auctioned, as described below.

FIG. 5 illustrates an example table 500 for an item database, which includes one or more records 502, with one record for each item being auctioned. In general, each record associates an item identifier 504 with an item description 506 and optionally additional information such as an item category 508. The item description may be a textual description, list of features or any other information that serves to describe the item and/or enable a comparison of the item to other items. A selling price 510 also may be stored. Each item may have an associated behavior identifier 512, which indicates the auction behavior used for the auction of that item. A list of registered bidders also may be stored. Entries in this database are made and updated as sellers register items for auction, when a behavior is assigned to an auction and when an auction ends.

FIG. 6 illustrates an example table 600 for a rule database, which includes one or more records 602. This rule database may be used by the rule selector 110 of FIG. 1. Each record 602 in the rule database relates a behavior identifier 604 with a rule identifier 606. Each behavior also may have an associated description 608 that provides a prose description of the behavior. Similarly, each rule may have an associated description 610 that provides a prose description of the rule. Although the example table 600 illustrates one specific rule associated with each behavior, each behavior may be associated with one or more rules. The one or more rules may be specific or may include variables that are assigned different values for different proxy bidders. How behaviors may be associated with rules is described in more detail below.

FIG. 7 illustrates an example table 700 for a proxy bidder database that stores information about proxy bidders. This table includes one or more records 702, wherein each record includes a bidder identifier 704 and an item identifier 706 or other identifier of the auction. A proxy bidder also may have an associated rule identifier 708, which refers to a record in the rule database, and a bid ceiling, or maximum bid 710. This information enables the auction server to control the operation of all proxy bidders at a central location.

FIG. 8 illustrates an example record 800 from an auction database. This database stores information about present and past auctions. In the example shown in FIG. 8, a record 800 may include an item identifier 802, an auction start date and

US 7,801,802 B2

| 9 | 10 |

time **804**, an auction end date and time **806**, a current number of participating bidders **808** and a bid increment amount **810**. The number of bidders may be inferred from a list of bidders associated with this item stored in either field **808** of this table **800** or in the item database. A list **812** includes one or more entries **814**, wherein each entry associates a bidder **816** with a bid amount **818**, a bidding time **820** and a type **822** of the bidder.

Each database may be any kind of database, including a relational database, object-oriented database, unstructured database or other database. Example relational databases include Oracle 8i from Oracle Corporation of Redwood City, Calif., Informix Dynamic Server from Informix Software, Inc. of Menlo Park, Calif., DB2 from International Business Machines of Yorktown Heights, N.Y., and Access from Microsoft Corporation of Redmond, Wash. An example object-oriented database is ObjectStore from Object Design of Burlington, Mass. An example unstructured database is Notes from the Lotus Corporation, of Cambridge, Mass. A database also may be constructed using a flat file system, for example by using files with character-delimited fields, such as in early versions of dBASE, now known as Visual dBASE from Inprise Corp. of Scotts Valley, Calif., formerly Borland International Corp. Notwithstanding these possible implementations of the foregoing databases, the term database as used herein refers to any data that is collected and stored in any manner accessible by a computer.

Having now described the databases maintained by the auction server in this embodiment, the various operations performed by the auction server will now be described. Referring to FIG. **9**, these operations include, but are not limited to, initializing (**900**) an auction by receiving information from a seller about the seller and the item to be offered for sale, determining (**902**) a desired auction behavior for an auction, registering (**904**) bidders for an auction, creating (**906**) a proxy bidder for a registered bidder, assigning (**908**) bidding rules to proxy bidders, and processing (**910**) bids received from bidders. Optionally, the behavior of the auction also may be characterized (**912**). During the auction, the actual auction behavior and the desired auction behavior are different, and rules may be updated to effect the desired auction behavior. The various operations in FIG. **9** need not be performed sequentially or in the order shown. These various operations will now be described in more detail.

Referring to FIG. **10**, to initialize an auction, information about the seller and the item to be auctioned is received (**1000**) from the seller by the auction server. Information about the seller, in an embodiment using the database structure described above, may include a seller name, email address, and payment identifier. Information about the item may include a description of the item and a category. Any conventional registration process and mechanism may be used to obtain this information from a seller. The seller information and the item information may be provided separately and at different times, enabling the seller to register once, but offer multiple items for auction at different times.

Records in the seller information database of FIG. **4** and the item information database of FIG. **5** are created or updated (**1002**) using the received information. In particular, the auction server associates a seller identifier with the seller information and an item identifier with the item. A record for the seller is created in the seller database and for the item in the item database, "linked" by the item identifier. The selling price (**510** in FIG. **5**) for the item is set to an arbitrary initial value.

A table **800** (FIG. **8**) for the auction is then created (**1004**), which is associated to the item database through the item

identifier (**802** in FIG. **8**). The auction start time **804** and end time **806** may be specified by the seller or the auction server. The current number of participating bidders **808** is initially set to zero. The bid increment amount may be set by the auction server, by a third party through the auction server, or by the seller. An initial bid amount also may be provided and stored in an entry **814** in the list **812**.

Referring to FIG. **11**, after initializing the auction, a desired auction behavior may be determined for the auction. The selection of a desired auction behavior, from which the rules for proxy bidders may be generated, generally is performed by receiving information about the auction and matching this information about the auction to a behavior that is likely to provide the best beneficial outcome. This matching may be performed in many ways. For example, matching the auction to a behavior may involve receiving (**1100**) information about one or more prior auctions, wherein each prior auction has an associated auction behavior. At least one of the prior auctions is identified as similar to the current auction. For example, the information about the auction, such as the item description, item category, seller information and/or information in the auction database (FIG. **8**), may be compared (**1102**) to the information about the one or more prior auctions. One or more of the prior auctions identified as similar to the current auction is then selected (**1104**). Typically, the prior auction that is selected is the auction that has the best beneficial outcome among the prior auctions identified as similar to the current auction. For example, the auction that is selected may be the auction with the highest price, or fastest sale, or other beneficial outcome. Because the selected prior auction is associated with an auction behavior, for example, through the database of FIG. **5**, the auction behavior of that selected prior auction now may be used for the current auction. An identifier and description of the identified behavior is stored (**1106**) in the database shown in FIG. **5**.

Referring to FIG. **12**, after initializing the auction, bidders may register to participate in the auction. Bidders may register prior to a desired auction behavior being selected for the auction. Information about the bidder is received (**1200**) by the auction server. Information about the bidder, in an embodiment using the database structure described above, may include a name, mailing address, email address, and/or payment identifier. Any conventional registration process and mechanism may be used to obtain this information from a bidder.

Records in the bidder database of FIG. **3** are created or updated (**1202**) using the received information. In particular, the auction server associates a bidder identifier with the bidder information, and a record for the bidder is created in the bidder database. Entries in a bidder database, such as is shown in FIG. **3**, may be created and updated separately for each auction. Bidders also may register with the auction server separately from registering to participate in an auction. In this embodiment, records may be created and updated in the bidder database independently of the auctions. The bidder's information is associated (**1204**) with the auction in any of the ways described above.

Referring to FIG. **13**, at any time before or during the auction, and after the selection of the desired auction behavior, a registered bidder may create and/or modify a proxy bidder. Information specifying the bidding behavior of the proxy bidder is received (**1300**) from the bidder by the auction server. Such information, in an embodiment using the database structure described above, may include a maximum bid and an indication of the auction or auctions for which the proxy bidder is to be used. The identity of the bidder may be determined through any conventional authentication process or

US 7,801,802 B2

11

mechanism, possibly using the bidder database of FIG. 3. A corresponding record is then created or updated (1302) by the auction server in a proxy bidder database, such as shown in FIG. 7.

Referring to FIG. 14, when a proxy bidder is created, the auction server also associates one or more rules with the proxy bidder to effect the desired auction behavior. These rules may be assigned statically or dynamically to the proxy bidder. In an embodiment using the database structure described above, using the item identifier, the selected desired auction behavior for the auction is retrieved (1400) from the item database (FIG. 5).

A rule identifier associated with the desired auction behavior is selected (1402) from the rule database in FIG. 6. In general, the assignment of the bidding rules to proxy bidders is coordinated so that the desired auction behavior is achieved. A rule may be selected sequentially or randomly for each proxy bidder from the rules associated with the desired auction behavior. The one or more rules may be specified such that the condition includes a variable that is assigned differently for each proxy bidder. The variable may have a range of candidate values, from which a particular value for a rule for a proxy bidder is selected. The rule generator may take various other information into account to assign rules. For example, the bid ceiling of each bidder, the length of the auction and the number of bidders may be used to select a rule. An implementation for creating the rule database of FIG. 6 is described in more detail below in connection with FIG. 17. The selected rule identifier is stored (1404) in the proxy bidder database (708), associated with the identifier of the bidder who created the proxy bidder and the item identifier.

Referring to FIG. 15, after registration of a seller, an item, and bidders, and after initialization of the auction information, bidding in an auction may commence at or after the specified auction start time. During the auction, the auction server receives (1500) both manually and automatically generated bids. Conflicting bids may be processed in any appropriate manner, using any conventional process or mechanism. If proxy bidders are implemented by the auction server, coordination by the auction server of bids from proxy bidders with the receipt of bids from manual bidders may be performed using any conventional process or mechanism, as described below. For each bid that is received, if the bid complies with the auction rules, as determined at 1502, entry 814 corresponding to the bid is added (1504) to table 800 (FIG. 8), including the identifier of the bidder, the bid amount, the time at which the bid was placed and the type of bidder (whether manual or proxy). A bid that does not comply with the auction rules may be rejected (1506) by the auction server. After a bid is processed, if the auction is not over, as determined at 1508 by comparing the current time to the auction end date/time 808 (FIG. 8), more bids may be received (1500). Also, as noted above, any time during the auction, the behavior of the auction may be characterized (such as described below in connection with FIG. 16) and rules associated with the proxy bidders may be modified. If the auction is over, the selling price may be stored (1510) in the item database (510 in FIG. 5).

The operation of a proxy bidder may be initiated in many ways, and at many times. For example, each proxy bidder may be evaluated by the auction server after each bid is placed, or after each period of time has passed. The auction server may determine whether each proxy bidder could place a bid, for example, by determining whether any prior bid was exceeded and whether the maximum bid was exceeded. If the proxy bidder could place a bid, its associated rule is applied. If the conditions of the rule are satisfied, then a new bid is

12

submitted for the proxy bidder to the auction manager. A bid from each proxy bidder may be computed and submitted, e.g., in sequence, in parallel, in a round-robin manner or in any other manner desirable.

Alternatively, a proxy bidder may be separate program, for example executed on a client machine, or may be one or more separate threads of a program executed by the auction server, or may be an autonomous or semiautonomous agent. If proxy bidders are not centrally controlled, as in these embodiments, the database of data shown in FIG. 7 may be omitted. In this embodiment, a bid from a proxy bidder is handled by the auction server as if it were a manually submitted bid.

If proxy bidders are centrally controlled, proxy bidders may be delayed in submitting proxy bids for long enough to prompt the manual bidders to create proxy bidders near the end of an auction. This notification would enable manual bidders to continue participating in the auction and may help increase the purchase price of the item.

After a number of bids has been received in an auction, whether during or after the auction, the behavior of the auction may be characterized, as noted at 912 in FIG. 9. Referring to FIG. 16, how such a characterization of the behavior of an auction may be derived from data about the actual bidding information in the auction will now be described. For example, the auction behavior may be characterized using the frequency with which bids were placed, and amounts by which bids exceeded any previous bids in the auction. Various mathematical processes may be applied to the data to determine this and other information that may characterize the behavior of the auction. For example, in an embodiment using a database such as shown in FIG. 8, the total number of bids is computed (1600). The amount of time between the first bid and the last bid is computed (1602). The difference between the first bid and the last bid is computed (1604). From this information, an average frequency and increment may be determined.

Other historical data which may be used to characterize the behavior of an auction includes information about the bidders, such as the bidder's history with the auction server, including, but not limited to, how many items the bidder has bid for an item, how much money has been spent by the bidder and the auction behavior that enticed the bidder to bid aggressively or spend the most amount of money. The time of the year the auction was conducted also may be relevant. Auctions also may be compared to determine which behaviors are associated with the best outcomes among a set of similar auctions. In this manner, the auction server collects data about kinds of behaviors that produce the best outcomes in various auctions.

If the behavior of the current auction is characterized during the auction, the behavior of the current auction may be compared to the desired auction behavior to determine whether the desired auction behavior is being achieved. The rule assignments then may be changed dynamically during the auction depending on whether the desired auction behavior is being achieved. For example, if the desired auction behavior is to have bids occurring every five minutes, with and average increment of two dollars, and the actual behavior has bids occurring every two minutes, the proxy bidders rules may be changed so as to increase the average amount of time between proxy bids.

Referring now to FIG. 17, how a desired auction behavior is associated to rules, which are selected and assigned to the proxy bidders, will now be described. In particular, as noted above, one or more rules may be associated with an auction behavior, which is defined. A specification of the desired auction behavior is received (1700), for example, as an aver-

US 7,801,802 B2

13

age bidding frequency and average bidding increment. The average bidding frequency and average bidding increment are used to define (**1702**) one or more variables. These variables may have a range of candidate values defined from actual auction behaviors. A single variable rule may be specified, with the range of candidate values, and stored in the rule database, from which specific rules may be derived as rules are assigned to proxy bidders. Alternatively, multiple specific rules may be specified (**1704**). The defined rules, whether general or specific, are stored in the rule database, associated with the desired auction behavior.

Referring now to FIG. **18**, a block diagram of the activities described in FIGS. **9-17** and how they interact with the databases of FIGS. **3-8** will now be described. As indicated at **1800**, initialization of the auction uses the seller database **1802**, item database **1804** and auction database **1806**. Selection **1808** of a desired auction behavior uses at least the item database **1804** and the auction database **1806**. Registration **1810** of the bidder uses the bidder database **1812**, and optionally the item database **1804** or the auction database **1806** to associate the bidder with the auction. Creation or modification **1814** of a proxy bidder for a bidder uses the proxy bidder database **1816**. The bidder database **1812** and item database **1804** may be used for verification purposes. Assignment **1818** of rules uses the item database **1804**, rule database **1820** and the proxy bidder database **1816**. Processing **1822** of bids uses the proxy bidder database **1816**, item database **1804** and auction database **1806**. Characterization **1824** of an auction uses the auction database **1806** and may use the rules database **1820**. Creation **1826** of the rules database **1820** uses the auction database **1806**, and other information as desired.

A computer system with which the various elements of the auction system of FIG. **1** and/or FIG. **18** may be implemented either individually or in combination typically includes at least one main unit connected to both an output device which displays information to a user and an input device which receives input from a user. The main unit may include a processor connected to a memory system via an interconnection mechanism. The input device and output device also are connected to the processor and memory system via the interconnection mechanism.

One or more output devices may be connected to the computer system. Example output devices include cathode ray tubes (CRT) display, liquid crystal displays (LCD) and other video output devices, printers, communication devices such as a modem, storage devices such as a disk or tape, and audio output. One or more input devices may be connected to the computer system. Example input devices include a keyboard, keypad, track ball, mouse, pen and tablet, communication device, and data input devices such as audio and video capture devices. The invention is not limited to the particular input or output devices used in combination with the computer system or to those described herein.

The computer system may be a general purpose computer system which is programmable using a computer programming language, such as C, C++, Java, or other language, such as a scripting language or even assembly language. The computer system may also be specially programmed, special purpose hardware, or an application specific integrated circuit (ASIC). The bidder's device also may be a pager, telephone, personal digital assistant or other electronic data communication device.

In a general purpose computer system, the processor is typically a commercially available processor, of which the series x86 and Pentium series processors, available from Intel, and similar devices from AMD and Cyrix, the 680x0 series microprocessors available from Motorola, the Pow-

14

erPC microprocessor from IBM and the Alpha-series processors from the former Digital Equipment Corporation, and the MIPS microprocessor from MIPS Technologies are examples. Many other processors are available. Such a microprocessor executes a program called an operating system, of which WindowsNT, Windows 95 or 98, IRIX, UNIX, Linux, DOS, VMS, MacOS and OS8 are examples, which controls the execution of other computer programs and provides scheduling, debugging, input/output control, accounting, compilation, storage assignment, data management and memory management, and communication control and related services. The processor and operating system defines computer platform for which application programs in high-level programming languages are written.

A memory system typically includes a computer readable and writeable nonvolatile recording medium, of which a magnetic disk, a flash memory, and tape are examples. The disk may be removable, known as a floppy disk, or permanent, known as a hard drive. A disk has a number of tracks in which signals are stored, typically in binary form, i.e., a form interpreted as a sequence of one and zeros. Such signals may define an application program to be executed by the microprocessor, or information stored on the disk to be processed by the application program. Typically, in operation, the processor causes data to be read from the nonvolatile recording medium into an integrated circuit memory element, which is typically a volatile, random access memory such as a dynamic random access memory (DRAM) or static memory (SRAM). The integrated circuit memory element allows for faster access to the information by the processor than does the disk. The processor generally manipulates the data within the integrated circuit memory and then copies the data to the disk after processing is completed. A variety of mechanisms are known for managing data movement between the disk and the integrated circuit memory element, and the invention is not limited thereto. The invention is not limited to a particular memory system.

Such a system may be implemented in software or hardware or firmware, or any combination thereof. The various elements of the system, either individually or in combination may be implemented as a computer program product tangibly embodied in a machine-readable storage device for execution by a computer processor. Various steps of the process may be performed by a computer processor executing a program tangibly embodied on a computer-readable medium to perform functions by operating on input and generating output. Computer programming languages suitable for implementing such a system include procedural programming languages, object-oriented programming languages, and combinations of the two.

The invention is not limited to a particular computer platform, particular processor, or particular high-level programming language. Additionally, the computer system may be a multiprocessor computer system or may include multiple computers connected over a computer network. Various possible configurations of computers in a network permit many users to participate in an auction, even if they are dispersed geographically.

Each module or step shown in the accompanying figures and the substeps or subparts shown in the remaining figures may correspond to separate modules of a computer program, or may be separate computer programs. Such modules may be operable on separate computers or other devices. The data produced by these components may be stored in a memory system or transmitted between computer systems or devices. The plurality of computers or devices may be interconnected by a communication network, such as a public switched tele-

US 7,801,802 B2

**15**

phone network or other circuit switched network, or a packet switched network such as an Internet protocol (IP) network. The network may be wired or wireless, and may be public or private.

Having now described a few embodiments, it should be apparent to those skilled in the art that the foregoing is merely illustrative and not limiting, having been presented by way of example only. Numerous modifications and other embodiments may be made. For example, rules may be applied in order to test their effect when placed at specific times during an auction. Rules to be applied to proxy bids also may be specified by the bidder of the item. Such capability may provide the bidder influence on how other bidders behave in the auction, and provide more feeling of control. A bidder may be required to pay for this service. In addition, when proxy bidders are bidding in the last moments of an auction against manual bidders, the auction server could delay submitting proxy bids for long enough to prompt the manual bidders to submit bid ceilings so that they have a chance of remaining in the auction. This notification would enable manual bidders to continue participating in the auction and may help the item be purchased for a higher price, thus benefiting the auctioneer and the seller of the item. The notification may be available only for an additional cost if desired.

What is claimed is:

1. A method comprising:

storing a rule for automatically placing a bid by a bid generator for an item for a bidder in an auction, the rule associated with the bidder and having a condition specifying that the bid is to be placed by the bid generator according to an amount of time left in the auction;

determining that the rule is satisfied;

determining that the highest bid in the auction is not from the bidder; and

placing the bid.

2. The method of claim 1, wherein the rule further comprises a second condition defined by information about the auction.

3. The method of claim 2, wherein the information about the auction includes at least one of a number of bids subsequent to a previous bid by the bidder, or a period of time elapsed since the previous bid by the bidder.

4. The method of claim 2, wherein the information about the auction includes at least one of information about bidders participating in the auction, information about bidders registered for the auction, information about a status of the auction, or information about the item.

5. The method of claim 1, in which placing the bid further comprises increasing the speed of placing a next bid for the bidder following a bid from a different bidder.

6. A computer readable medium storing executable instructions configured to direct a processor to:

store a rule for automatically placing a bid by a bid generator for an item for a bidder in an auction, the rule

**16**

associated with the bidder and having a condition specifying that the bid is to be placed according to an amount of time left in the auction; determine that the rule is satisfied; determine that the highest bid in the auction is not from the bidder; and place the bid.

7. The computer readable medium of claim 6, in which the instructions for establishing the rule further comprises a second condition defined by information about the auction.

8. The computer readable medium of claim 7, in which the instructions comprising the second condition further comprises instructions configured to direct the processor to receive information concerning at least one of a number of bids subsequent to a previous bid by the bidder, or a period of time elapsed since the previous bid by the bidder.

9. The computer readable medium of claim 7, in which the instructions comprising the second condition further comprises instructions configured to direct the processor to receive information concerning at least one of information about bidders participating in the auction, information about bidders registered for the auction, information about a status of the auction, or information about the item.

10. The computer readable medium of claim 6, in which the instructions for placing the bid further comprises instructions configured to direct the processor to increase the speed of placing a next bid for the bidder following a bid from a different bidder.

11. A system, comprising:

a rule application engine having an output indicative of when to automatically place a bid in an auction according to a rule associated with a bidder and having a condition specifying that the bid is to be placed according to an amount of time left in the auction; and

a bid generator, having an input for receiving the rule associated with the bidder and having an output configured for providing, when the rule is satisfied, an indication of the bid according to the condition if a highest bid in the auction is not from the bidder.

12. The system of claim 11, wherein the rule further comprises a second condition defined by information about the auction.

13. The system of claim 12, wherein the information about the auction includes at least one of a number of bids subsequent to a previous bid by the bidder, or a period of time elapsed since the previous bid by the bidder.

14. The system of claim 12, wherein the information about the auction includes at least one of information about bidders participating in the auction, information about bidders registered for the auction, information about a status of the auction, or information about the item.

15. The system of claim 11, the output of the bid generator being further configured for increasing the speed of placing a next bid for the bidder following a bid from a different bidder.

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

*Walker Digital, LLC v. Microsoft Corporation,* 2013-1584

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by RUSS, AUGUST & KABAT, attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **February 10, 2014** counsel for Appellant has authorized me to electronically file the foregoing **Opening Brief for Appellant Walker Digital, LLC** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Frank Scherkenbach
*(principal counsel)*
Fish & Richardson, P.C.
One Marina Park Drive
Boston, MA 02210
617-521-7883
scherkenbach@fr.com

John A. Dragseth
Fish & Richardson, P.C.
60 South Sixth Street
Dain Rauscher Plaza
Minneapolis, MN 55402
612-337-2550
dragseth@fr.com

Isabella Fu
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
425-722-4846
isabelfu@microsoft.com

Ryan Patrick O'Connor
Jason W. Wolff
Fish & Richardson, P.C.
12390 El Camino Real
San Diego, CA 92130
858-678-5070
oconnor@fr.com
wolff@fr.com

*Counsel for Defendant-Appellee Microsoft Corporation*

Michael J. Malecek
*(principal counsel)*
Timothy Chao
Robert Magee
Kaye Scholer LLP
3000 El Camino Real
2 Palo Alto Square
Palo Alto, CA 94306
650-319-4500
michael.malecek@kayescholer.com
timothy.chao@kayescholer.com
robert.magee@kayescholer.com

Adam Conrad
King & Spalding LLP
100 N. Tryon St
Charlotte, NC 28202
704-503-2600
aconrad@kslaw.com

Daryl Joseffer
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-737-0500
djoseffer@kslaw.com

*Counsel for Defendant-Appellee Google, Inc.*

Paper copies will also be mailed to the principal counsel noted at the addresses

noted above when the paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

February 10, 2014

/s/ Robyn Cocho
Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains 6,152 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

      The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

      The brief has been prepared in a monospaced typeface using_____ _____in a ___ characters per inch_____ font.

February 10, 2014                /s/ *Marc A. Fenster*

Date                                Marc A. Fenster

                                     Counsel for Appellant