No. 13-1584

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

WALKER DIGITAL, LLC,

*Plaintiff-Appellant,*

v.

MICROSOFT CORPORATION and GOOGLE, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Delaware in No. 11-CV-0311, Judge Richard G. Andrews.

## BRIEF OF APPELLEES

FRANK E. SCHERKENBACH
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210-1878
(617) 542-5070
scherkenbach@fr.com

JASON W. WOLFF
RYAN P. O'CONNOR
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070
jwolff@fr.com
oconnor@fr.com

*Attorneys for Defendant-Appellee
Microsoft Corporation*

MICHAEL J. MALECEK
TIMOTHY CHAO
KAYE SCHOLER LLP
Two Palo Alto Square, Suite 400
3000 El Camino Real
Palo Alto, CA 94306
(650) 319-4500
Michael.Malecek@kayescholer.com
Timothy.Chao@kayescholer.com

DARYL JOSEFFER
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20007
(202) 626-2388
djoseffer@kslaw.com

*Attorneys for Defendant-Appellee
Google Inc.*

May 21, 2014

(additional counsel on inside cover)

JOHN A. DRAGSETH
FISH & RICHARDSON P.C.
60 South Sixth Street – Suite 3200
Minneapolis, MN 55402
(612) 335-5070
dragseth@fr.com

ISABELLA FU
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052-6399
(425) 722-4846
isabella.fu@microsoft.com

*Attorneys for Defendant-Appellee*
*Microsoft Corporation*

ADAM CONRAD
KING & SPALDING LLP
100 N Tryon Street
Suite 3900
Charlotte, NC 28202
(704) 503-2600
aconrad@kslaw.com

*Attorney for Defendant-Appellee*
*Google Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Google Inc. certifies the following:

1.     The full name of every party represented by me is:

Google Inc.

2.     The name of the real party in interest represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.     The names of all law firms and the partners and associates that appeared for Appellee in the district court or are expected to appear in this Court are:

Kaye Scholer LLP: Michael J. Malecek and Timothy Chao

King & Spalding LLP:  Daryl L. Joseffer and Adam M. Conrad

Dated:  May 21, 2014                              /s/ *Michael J. Malecek*
                                                 Michael J. Malecek

                                                 *Attorney for Defendant-Appellee*
                                                 *Google Inc.*

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Microsoft Corporation certifies the following:

1.    The full name of every party represented by me is:

Microsoft Corporation

2.    The name of the real party in interest represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Fish & Richardson P.C.: Frank E. Scherkenbach, Jason W. Wolff, Ryan P. O'Connor, Tamara Fraizer, Neil A. Warren, Tara D. Elliott, William J. Marsden, Jr., and John A. Dragseth

Date:  May 21, 2014                  */s/ Frank E. Scherkenbach____*
                                     Frank E. Scherkenbach

                                     *Attorney for Defendant-Appellee Microsoft Corporation*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION...........................................................1

INTRODUCTION ........................................................................1

STATEMENT OF THE ISSUE ...........................................................3

STATEMENT OF THE CASE............................................................3

    A.    Walker Digital's Patent Claims The Placement Of Bids By A Proxy Bidder According To The Amount Of Time Left In An Auction. ........................................................................3

    B.    Defendants' Advertising Services Conduct Auctions With A Single Round Of Bidding In Less Than A Second. ...........................6

        1.    Google's Advertising Services. ...................................6

        2.    Microsoft's Advertising Services. ...............................8

    C.    Procedural History................................................................8

        1.    Walker Digital Searched For An Infringement Theory. ............9

        2.    The Parties Engaged In Early Claim Construction..................10

        3.    The District Court Construed "Auction" To Mean A Single Sale, Not A Multi-Sale Event. .......................................11

SUMMARY OF ARGUMENT ..........................................................13

STANDARD OF REVIEW ..............................................................15

ARGUMENT ..........................................................................15

I.    "AUCTION" DOES NOT HAVE A SINGLE ORDINARY MEANING. ........................................................................15

II.    THE '802 PATENT CLAIMS A METHOD OF PROXY BIDDING FOR INDIVIDUAL AUCTION SALES. .......................................17

i

A.    The Claim Language Requires The District Court's Construction. .......................................................................17

      1.    The "Amount Of Time Left In The Auction" Limitation Demonstrates That "Auction" Refers To A Single Sale...........18

      2.    Even Walker Digital's Construction Of The "Highest Bid In The Auction" Limitation Shows That "Auction" Refers To A Single Sale...........................................22

B.    The Specification Confirms That An "Auction" Is A Single Sale. ....................................................................25

III.    WALKER DIGITAL'S LITIGATION-DRIVEN CONSTRUCTION IS UNSUPPORTED. ...........................................................28

A.    There Is No Intrinsic Support For Walker Digital's Position. ............28

B.    Prior-Art Uses Of "Auction" Are Either Irrelevant Or Supportive Of The District Court's Construction. ..............................31

CONCLUSION ........................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Bid for Position, LLC v. AOL, LLC,*
    601 F.3d 1311 (Fed. Cir. 2010)..........................................................................7

*DeMarini Sports, Inc. v. Worth, Inc.*,
    239 F.3d 1314 (Fed. Cir. 2001)........................................................................33

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009)................................................................ 15, 30

*Exhibit Supply Co. v. Ace Patents Corp.*,
    315 U.S. 126 (1942)........................................................................................21

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) (en banc)......................................................15

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)........................................................................................17

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc)..........................................................32

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1988)......................................................................30

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................31

*Pause Tech. LLC v. TiVo Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005)......................................................................30

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................. passim

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008)......................................................................25

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)................................................... 13, 16, 17, 28

*Ring Plus, Inc. v. Cingular Wireless Corp.*,
    614 F.3d 1354 (Fed. Cir. 2010)............................................................. passim

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013)......................................................................15

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012).......................................................................30

*TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*,
  375 F.3d 1126 (Fed. Cir. 2004).......................................................................16

*TiVo Inc. v. Echostar Commc'ns Corp.*,
  516 F.3d 1290 (Fed Cir. 2008).......................................................................27

*Trading Techs Int'l, Inc. v. eSpeed, Inc.*,
  595 F.3d 1340 (Fed. Cir. 2010).............................................................. 28, 31

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)................................................................ 29, 32

## STATEMENT OF RELATED CASES

There is no related case.

## STATEMENT OF JURISDICTION

Defendants agree with Walker Digital's jurisdictional statement.

## INTRODUCTION

Walker Digital would stretch its patent claims past their breaking point—the patented invention would not even work as intended under Walker Digital's construction, which all of the intrinsic evidence refutes.  The asserted patent relates to automated bidding, *i.e.*, proxy bidding, in online auctions such as those conducted by eBay.  Prior-art proxy bidders placed a bid for an item up for auction immediately after another bidder exceeded the proxy's previous bid.  That process frustrated human bidders, who would be instantly outbid by automated proxies time after time.  The patented method attempts to foster a more natural process by preventing instantaneous bidding and instead having proxies place bids based on the "amount of time left in the auction."  A73.

In contrast, Defendants' accused services employ single-round, nearly instantaneous auctions to select advertisements for display next to search results on a webpage.  Because bids are pre-set and made simultaneously, with no option for delayed or sequential bidding, proxies cannot instantly outbid other bidders and bids cannot be placed according to the amount of time left in the auction.  Thus,

the accused services implicate neither the problem nor the solution identified by the '802 patent.

To force these facts into a makeshift infringement theory, however, Walker Digital asserts that the claimed "auction" is the combination of all of the hundreds of millions of auctions that occur on any given day, rather than an individual auction. In other words, Walker Digital construed "auction" not to mean a single *sale*, but an *event* at which multiple sales occur.

The district court soundly rejected that effort to recast the patented invention. Walker Digital relied primarily on the specification's statement that an "auction" is "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." A67 4:46–48. As the court explained, that high-level, general language does not address the more specific question presented here, which is whether the "auction" in the '802 patent's claims is "a 'sale' or the event at which multiple sales take place." A4 n.2. "In common English usage," the word could take either of those meanings, depending on the context. *Id.* Here, the context leaves no doubt that "auction" refers to "one sale," not a multi-sale event. A2.

The claimed method would not even work as intended if the "auction" were a multi-sale event. A73. It is undisputed that Walker Digital's construction of "auction" would cause proxies to bid for the wrong items or to bid against

themselves in most instances.  Walker Digital also conceded in the district court that "auction" means a single sale for purposes of one of the claim limitations; Walker Digital's contention that the same word takes a different meaning when used in other parts of the same claims finds no support in law or logic.  The specification similarly refutes Walker Digital's overreaching by consistently "treat[ing] each item as a single auction" and "using 'auction' synonymously with 'single sale.'"  A3 & n.1.

## STATEMENT OF THE ISSUE

Whether the term "auction," as used in the asserted claims of U.S. Patent No. 7,801,802 ("'802 patent"), refers to a single sale or an event at which multiple sales take place.

## STATEMENT OF THE CASE

Walker Digital's statement of facts presents the parties' claim construction dispute in a vacuum, without describing much of the context or the reasons why Walker Digital had to stipulate to a judgment of no infringement under the district court's claim construction.  Google and Microsoft therefore submit this complete statement of the case.

### A.    Walker Digital's Patent Claims The Placement Of Bids By A Proxy Bidder According To The Amount Of Time Left In An Auction.

The '802 patent relates to the use of proxy bidders that "place[] bids automatically" (A66 1:33–34; *see also id.* 1:25–46) in timed, online auctions, such

3

as those offered by eBay.  *See id.* 1:25–2:15; A426.  While such an auction is underway, bidders may increment their bids in light of other bids and the amount of time remaining in the auction to become the highest bidder for that item.  The '802 patent characterizes prior-art proxy bidders as simple programs that would place a bid "instantly after" detecting "that the previous bid is surpassed."  A66 1:38–40, 45–46.  This "discouraged [manual bidders] from participation" in online auctions, *id.* 1:58–63, because their bids would "be outbid instantly time after time" in round after round of bidding, A418.

The '802 patent purports to solve this problem by placing bids at a "determined time" instead of "immediately after the bidder's prior bid is exceeded."  A66 1:67–2:2; A68 5:56–59.  That time is based on the "amount of time left in the auction."  A73 15:31, 16:2–3, 16:31–32; *see also* A68 6:64–66.  Claim 1 is representative:

> 1.    A method comprising:
>
> storing a rule for automatically placing a bid by a bid generator *for an item* for a bidder in an auction, the rule associated with the bidder and having a condition specifying that the bid is to be placed by the bid generator *according to an amount of time left in the auction*;
>
> determining that the rule is satisfied;
>
> determining that *the highest bid in the auction* is not from the bidder; and
>
> placing the bid.

A73 15:26–35 (emphases added).

After the PTO repeatedly rejected its initial claims, Walker Digital overcame those rejections by amending every claim to add the "amount of time left" limitation. *See* A213; A603–06; A612; A633. In Walker Digital's words, this limitation is what made its claims "patentably distinct" over the prior art. A408.

Apart from "determining when to place proxy bids," the '802 patent does not alter the ordinary operation of online auction systems. A419. The specification states that an "auction" is "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process," A67 4:46–48; a "bid" is "an offer from or on behalf of a bidder" that "includes an offered price for the good or service being auctioned," *id.* 4:53–55; and an "increment value" is "the amount by which the bid must exceed a previous bid," A68 5:37–38.

The specification consistently describes using the invention in an auction for a single item or lot, much like what one would expect to find on eBay's website (which Walker Digital identified as a "[p]otential [l]icensee," A426). The system initializes "an auction by receiving information from a seller about the seller and the item to be offered for sale." A70 9:32–33; *see also id.* 9:45–46. Likewise, "[a] bidder registers conventionally to bid for an item in an auction using a proxy bidder." A419. Bidders may participate in "one or more auctions." A67 4:53. And sellers may "register once, but offer multiple items for auction at different times." A70 9:55–56.

5

The specification goes on to describe the auction process as consisting of only a single sale. After an auction has begun, for example, "the auction server receives a bid on the item being auctioned." A423. The proxy bidder cannot bid against itself; it places bids only "[i]f the highest bid in the auction is not from the bidder." A66 2:64–67; *see also* A422. The auction system may store "information about the current bidding status," such as "the highest bid price"; "an identifier of the item" up for bid; "start and end dates and times of the auction"; and "a minimum increment amount for a bid to exceed a previous bid." A68 5:10–20. The system may also use historical data associated with "the item being auctioned" to establish proxy bidding rules for the auction (*i.e.*, an "auction behavior"). A421; *see also* A69 8:35–36. After "the auction is over, the selling price may be stored" in the database. A71 11:56–58.

### B. Defendants' Advertising Services Conduct Auctions With A Single Round Of Bidding In Less Than A Second.

Walker Digital alleges infringement by the online advertising services of Google and Microsoft, which select advertisements for display next to search results on www.google.com and www.bing.com, respectively. *See* A77, A78.

### 1. Google's Advertising Services.

Google's online advertising system, known as AdWords, allows advertisers to choose keywords (such as "summer vacation") that may trigger the display of

their advertisements.  *See* A136, 191.[1]  AdWords runs auctions to determine which ads, if any, will be shown on the search results page when users enter one of those keywords (or a related concept) in a search query.  *See* A136.  Google handles "more than a billion searches" each day along with "hundreds of millions of ad auctions."  A137; A331.

Because Google delivers search results in less than one second, and because it serves advertisements concurrently with those search results, AdWords must conduct "near instantaneous auction[s]" within "a fraction of a second."  A136. Each auction comprises "only . . . a single round of bidding," akin to a sealed bid auction.  *Id.*

A participating advertiser sets a maximum amount that it would be willing to pay if a user clicked on the advertisement in relation to a specific keyword or phrase.  *Id.*  Once submitted for a given auction, this amount does not change.  *See* A333.  The highest bid will not necessarily win an auction, in part because AdWords considers other factors such as the ad's relevance to the search term.  *See* A138, A186; *see also Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1312 (Fed. Cir. 2010).

---

[1] This Court has summarized many of the operative features of AdWords in a previous case.  *See Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1312 (Fed. Cir. 2010) (affirming judgment of no infringement).

## 2.   Microsoft's Advertising Services.

The relevant aspects of Microsoft's advertisement services operate in essentially the same way.  The services identify "a list of candidate ads" to display on a webpage and select ads "using a matching process that is computer-implemented."  A983.  "For each candidate ad, a single bid is placed to have that ad shown in the ad space for which an ad was requested.  The bid amount is specified before the ad request is made, it is not known by other bidders participating in the ad space sale, and it does not change once it is placed."  *Id.*

\* \* \*

Advertising campaigns in both of the accused systems operate continuously, 24 hours per day, every day of the year, year after year.  *See* A333; A983.  Because an advertiser cannot anticipate with certainty how many search queries will use its selected keywords, Defendants' systems allow advertisers to specify a maximum daily budget for an average day.  *See* A138; A332.  Advertisers may also schedule their campaigns and adjust their budgets for certain times of day, or days of the week.  *See* A137; A983.

### C.   Procedural History

On April 11, 2011, Walker Digital sued Google and Microsoft in one of 14 actions it filed that day against more than 100 defendants.  *See* A74; A142.  The other defendant in this suit, Yahoo!, has settled.  *See* A32.

8

### 1.     Walker Digital Searched For An Infringement Theory.

In a letter dated August 3, 2011, Google questioned Walker Digital's "basis to allege infringement" and urged it to withdraw its complaint.  A176–77.  Google contrasted the claims' requirement that bids be placed "according to an amount of time left in the auction" with the fact that AdWords auctions entail a single round of bidding that "occur[s] in literally fractions of a second."  A176; *see also* A143; A179–92.  Google explained that AdWords does not "calculate the time remaining in an auction" at all, much less place bids according to it.  A176.

Walker Digital responded that a "proper understanding of claim scope" did *not* require calculating the time remaining in the auction.  A195.  In its view, AdWords infringed simply by permitting advertisers to schedule ad campaigns for certain days of the week or times of day.  *See id.*

When Google made clear that Walker Digital's infringement theory eviscerated the "time left" limitation, *see* A144, Walker Digital unveiled a new theory:  It asserted that all auctions for a given keyword over the course of a calendar day are a single "auction" comprised of numerous "micro-auction[s]."  *See id.* & n.1; A217; *see also* A984.  In other words, Walker Digital argued that the claim term "auction" referred to an event comprising multiple auctions, akin to brick-and-mortar auction events held at the "famous auction house Christie's."  A234; A242; A263.

9

At that point, Google moved to dismiss the complaint and for sanctions under Federal Rule of Civil Procedure 11. *See* A112–13, A118, A123–27, A317. The district court denied Google's motion "without prejudice to renew." A362. "[T]hinking that there might be some merit to the Motion but that claim construction would better inform any decision," the court ordered "limited early claim construction" briefing of the claim term "auction." *Id.*

### 2.    The Parties Engaged In Early Claim Construction.

Defendants proposed to construe "auction" to mean "[a] public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process. An auction means a single auction, consisting of a single sale." A364. Walker Digital countered with "[a] public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." *Id.*

At the claim-construction hearing, Walker Digital's counsel conceded that, depending on the context, "[t]he common ordinary meaning of auction can include a single item sale or a multi-item sale. There's no dispute about that." A1118. Counsel further agreed that "there's not" an embodiment in the specification in which the claimed invention is used in a multiple-sale event. A1116.

The parties later filed additional claim construction briefing, and the court held a second *Markman* hearing on additional claim terms. As relevant here, the parties agreed to construe the phrase "the highest bid in the auction is not from the

10

bidder" to mean "the highest offer received for the item is not from the bidder," A764, but disputed the meaning of the phrase "amount of time left in the auction," A765.

The parties' dispute on the latter limitation turned again on the distinction between a sale and an event. Despite agreeing that "[t]he specification undoubtedly refers to single-item auctions," A774, Walker Digital argued that the claims referred to "the 'amount of time left in' an event," A765, and that, "if there are multiple lots within an 'auction,' we still look at the end time for the 'auction,' not for the lots," A899. Defendants responded that "[p]lacing a bid for an item according to the amount of time left in the auction event, where the auction sale of that item may no longer accept bids [if the item were already sold, for example] is nonsensical." A772.

### 3. The District Court Construed "Auction" To Mean A Single Sale, Not A Multi-Sale Event.

The district court agreed with Defendants that "[a]n auction consists of one sale." A2. The court reasoned that, "[i]n common English usage . . ., auction can mean either a 'sale' or the event at which multiple sales take place. The invention is clearly directed to the former and not the latter." A4 n.2. If "auction" were construed to cover a multiple-sale event, the claimed method "would not function as intended." A2. Because "the bid generator bids according to the time remaining in the 'auction,'" the court explained, it "might attempt to bid for an

11

item or lot in a sale that was already over" under Walker Digital's construction. A2–A3.

Construing "auction" to mean an event would also render the claims internally inconsistent because, "in the context of the highest bid [limitation], the bid must be for the particular item being sold in that auction," not some other item sold during the same event. A3. Walker Digital had agreed to that construction of the "highest bid in the auction" limitation, and the court held that "auction" must take the same meaning throughout each claim. *See id.*

The court found additional support in the specification, which "us[ed] 'auction' synonymously with 'single sale.'" A3 n.1. The court noted that "Figures 3 through 8, which describe the databases that manage the auctions and bidding, and the accompanying text [in the specification], treat each item as a single auction." A3. "If the auction could include multiple sales of multiple items, the proxy bidder would require more information to place a bid because it would not be able to determine on which item the bidder wishes to bid." *Id.*

Walker Digital stipulated that, "[i]n view of the Court's construction of the term 'auction,'" the accused advertising services do not infringe. A9; A11. On July 25, 2013, the district court entered final judgment. A10; A11.

## SUMMARY OF ARGUMENT

Meaning depends on context.  As the district court explained, "auction" has *two* relevant meanings in "common English usage"—"either a 'sale' or the event at which multiple sales take place."  A4 n.2.  The "bounteous context" provided by the surrounding claim language and the specification of the '802 patent leaves no doubt that the asserted claims use the term "auction" to refer to "one sale."  *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1251 (Fed. Cir. 1998); A2.

Every claim requires placing bids "according to an amount of time left in the auction."  A73 15:31.  Under Walker Digital's construction, however, "the 'amount of time left in the auction' would be the same for each of th[e] lots" sold in an auction event.  A898.  A bidder would therefore face the risk of bidding either before the auction for the desired item began or after it ended, thereby bidding on the wrong item.  Construing "auction" to mean an event, rather than a transaction, would therefore prevent the claimed method from fulfilling its intended purpose.

Similarly, the claims require that "the highest bid *in the auction* is not from the bidder."  A764 (emphasis added).  Walker Digital agreed that this limitation means that the bidder had not already submitted the highest bid "*for the item*" up for auction.  *Id.* (emphasis added).  Walker Digital thereby conceded that "the

auction" is for "the item"—a single sale. That concession was necessary because it would make no sense to condition bidding for one item on whether the bidder had submitted the highest bid for a *different* item. Because a term must be interpreted consistently within the same claim, Walker Digital's concession that "auction" means a single sale for purposes of the "highest bid in the auction" limitation is dispositive of the term's meaning throughout each claim. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

Moreover, the whole point of the claimed invention is to place bids "in a manner that seems natural and competitive." A66 2:5–6. Walker Digital's construction instead produces unnatural and uncompetitive system malfunctions. And it does so because Walker Digital is now trying to apply its patent to auctions that are wholly different from those disclosed in the patent's specification. As the district court explained, the specification consistently "treat[s] each item as a single auction" and "us[es] 'auction' synonymously with 'single sale.'" A3 & n.1. Walker Digital does not point to a single contrary example and, in fact, admitted to the district court that "there's not" an embodiment involving a multi-sale event. A1116.

Walker Digital relies on a passage in the specification stating that an "auction" is "a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." A67 4:46–48. Like dictionary

14

definitions, however, that statement is too general to resolve the specific question presented here. The standard claim construction principles discussed above therefore govern the term's meaning. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343–44 (Fed. Cir. 2009).

Walker Digital ultimately falls back on various prior-art references that, it claims, use the term "auction" to describe multi-sale events. But that simply confirms a point no one disputes—the term may, depending on context, refer to an event rather than a sale. As the district court held, only the single-sale definition is consistent with the claims and specification of the '802 patent.

## STANDARD OF REVIEW

Claim construction is a question of law that this Court reviews *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1277 (Fed. Cir. 2014) (en banc); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013), *cert. granted,* 134 S. Ct. 1761 (Mar. 31, 2014).

## ARGUMENT

## I. "AUCTION" DOES NOT HAVE A SINGLE ORDINARY MEANING.

Walker Digital's brief rests on a single false premise: that the district court "*limited* the claim term 'auction' to" something less than its plain and ordinary meaning. WD Br. 1 (emphasis added); *see also id.* at 5, 6, 7, 12, 13, 16, 17, 20, 21, 22, 23, 24, 26. Not so. As the district court observed, "[i]n common English usage

(as plaintiff's citations to dictionary definitions makes clear), auction can mean *either* a 'sale' *or* the event at which multiple sales take place." A4 n.2 (emphases added). By choosing one plain meaning of "auction" in lieu of another, the district court did not *limit* the scope of the ambiguous claim term; the court *interpreted* the term—the very purpose of claim construction. *See Renishaw*, 158 F.3d at 1251 (construing term that "has several meanings, each of which may prevail based on the context"); *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126 (Fed. Cir. 2004) (using ordinary interpretive principles to choose between ordinary meanings of "within").

Because the question here is *which* of the term's ordinary meanings is used in the '802 patent, dictionaries provide little help. They generally state that an auction is a sale in which "goods or services of a seller may be sold to a bidder through a bidding process." A67 4:47–48. That definition is undoubtedly correct as far as it goes, but it leaves open the more specific question presented here, which is whether the claimed "auction" in the '802 patent refers to a single sale or a multi-sale event. *See* A4 n.2. Indeed, Walker Digital conceded in the district court that "[t]he common ordinary meaning of auction can include a single item sale or a multi-item sale." A1118.

Having framed the issue incorrectly, Walker Digital advances mostly irrelevant arguments. For example, the rule against importing limitations from the

specification into the claims, *see* WD Br. 25, and the principle that only a "clear disavowal of claim scope" will limit the otherwise applicable claim scope, *id.* at 22, are irrelevant. The question is simply how to construe an express but ambiguous claim limitation. Before the district court, Walker Digital twice conceded that the parties' dispute had nothing to do with disavowal, but did implicate the claim "construction principle" that "you have to construe it so that the claims make sense." A1120; *see also* A1138. Walker Digital can hardly fault the district court for agreeing with it.

## II. THE '802 PATENT CLAIMS A METHOD OF PROXY BIDDING FOR INDIVIDUAL AUCTION SALES.

Claim terms must be construed "in a way that comports with the instrument as a whole." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996). The "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw*, 158 F.3d at 1250. The claim language, specification, and prosecution history of the '802 patent support only one conclusion: "auction" refers to a single sale, not a multi-sale event.

### A. The Claim Language Requires The District Court's Construction.

The claim language as a whole generally provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Here, it is

dispositive because the claimed method works for its intended purpose only when "auction" is construed to mean a single sale. *See* A2–3.

### 1. The "Amount Of Time Left In The Auction" Limitation Demonstrates That "Auction" Refers To A Single Sale.

Every claim of the '802 patent requires placing bids "according to an amount of time left in the auction." A73 15:31. This language makes sense when "auction" takes its ordinary meaning of a single sale. In a typical auction, the bidder would identify a desired item or lot, set a maximum bid price, and then direct the proxy bidder to place bids up to that maximum at intervals prior to the end of the auction for that item.

Under Walker Digital's proposed construction, however, the "time left" would be the time remaining for *all* sales of *all* items or lots at an auction event. As Walker Digital told the district court, "if there are multiple lots within an 'auction,' we still look at the end time for the 'auction,' not for the lots." A899. As a result, "the 'amount of time left in the auction' would be *the same* for each of those lots." A898 (emphasis added); *see also* A900.

The district court correctly found that the claimed method would not work for its intended purpose if construed in that way. *See* A2–3. "For example," the court explained, "assume that the bidder wished to bid for the item or lot in the first sale of the 'auction' and that the bid generator was set to bid with one minute left in the 'auction.'" A3. "If the bid generator did not place the bid until there was

18

one minute remaining in the multi-sale 'auction,' the sale of the first item would have already ended when the proxy bidder attempted to place the bid." *Id.*

Thus, under Walker Digital's proposed construction, bidders could not even control *what* they bid on. The proxy bidder would thwart, rather than serve, the bidder's fundamental objective of bidding on the item he or she desires. Claim constructions should not produce such awkward and unintended outcomes. *See Ring Plus, Inc. v. Cingular Wireless Corp.*, 614 F.3d 1354, 1364 (Fed. Cir. 2010) (construing "allowing" as "allowing to mean" in order to avoid illogical results).

Walker Digital repeatedly points to live auction events at auction houses, such as Christie's, yet it never explains how the claimed method could operate in that environment. *See* WD Br. 23–24. Auction events often have no fixed duration or schedule. The bidding period depends on, among other things, the number of bidders and how many rounds of bids they place on each lot. If the exact time at which an auction will end is unknown, however, a proxy bidder cannot bid according to the amount of time left in the auction, rendering Walker Digital's method unworkable.

Even if such an auction event had a pre-set end time, bidders would be gambling every time they used the claimed proxy bidder. In Walker Digital's favorite example, an auction of Eric Clapton's guitars, assume that a bidder wants to buy Lot 104 (a 1952 Telecaster) and instructs its proxy bidder to bid up to

$100,000 ten minutes before the end of the "auction." *See* A555. Whether the proxy bidder actually bid on the 1952 Telecaster or some other lot would depend on which lot was being sold ten minutes before the end of the event, which would depend on how quickly the bidding for various lots had gone.

Walker Digital does not deny that its claim construction produces these anomalies, which render its method unworkable in most if not all instances. *See* WD Br. 13, 16–17. Nor does it deny that the district court's construction eliminates all of these anomalies. *See id.* Rather, Walker Digital urges this Court to ignore them because the patented method might occasionally work as intended. *See id.* That is no way to construe a claim. While a bid might happen to be submitted by the proxy during the bidding for the desired item, and at the desired interval relative to the end of the bidding for that item, any such occurrence would be serendipity. The district court properly chose the construction that does not leave the claimed method's operation to chance. A stopped clock tells the correct time twice a day, but that would be no reason to construe a patent claim to cover a broken clock instead of one that works as intended.

Walker Digital protests that the claims do not require "that the bid actually result in the bidder winning the item on which she bid." *Id.* at 16. But winning or losing is beside the point. Walker Digital's claim construction makes it likely that the bidder would fail even to *bid* on the desired item—even though placing a bid

"for an item" is required by the claims and fundamental to the very concept of an auction.

Walker Digital contends that these errors might work themselves out because "the auction server may simply reject or change" bids "that 'do[] not comply with the auction rules.'" WD Br. 17 (quoting A71 11:48–49) (alteration in original). But rejecting bids for this reason would not *solve* the problem; it would *be* a problem. And Walker Digital's argument fails on its own terms. The relevant "auction rule[]" is the claims' requirement to place bids according to the time left in the auction. A68 6:47–48, 6:64–66; A73. The faulty bid in the district court's hypothetical complies with that rule—which is precisely why Walker Digital's construction does not work. *See* A3.

It bears emphasis that the "time left" element is what purportedly renders the claimed method "patentably distinct." A408. As the district court noted, Walker Digital added this claim limitation during prosecution for the purpose of overcoming rejections by differentiating its alleged invention from the prior art. *See* A1134; *see also* A213–14. That makes it all the more clear that the claims must be construed to effectuate this limitation, not to make gibberish out of it. *See, e.g.*, *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 137 (1942) (amendment made to overcome rejection "must be strictly construed against" patentee).

Finally, Walker Digital notes that, unlike the other asserted claims, independent claim 11 requires the proxy bidder to provide an "indication" of a bid rather than to place a bid. *See* WD Br. 17. But that difference has no bearing on the meaning of the term "auction." Placing an "indication" of a bid for an item that has already sold makes no more sense than placing the bid itself. Moreover, terms generally take the same meaning throughout a patent, and there is no evidence that the applicants intended "auction" to have a different meaning in claim 11 than in the other claims. *See* A3.

> ### 2. Even Walker Digital's Construction Of The "Highest Bid In The Auction" Limitation Shows That "Auction" Refers To A Single Sale.

Walker Digital's construction of "auction" also runs afoul of the agreed-upon construction of a second claim limitation. The parties agreed to construe "the highest bid *in the auction* is not from the bidder" to mean "the highest offer received *for the item* is not from the bidder." A3 (emphases added); A764. Walker Digital stands by that stipulated construction on appeal. *See* WD Br. 11. Thus, for all its protestations on appeal, Walker Digital has conceded that "the highest bid in *the* auction" is "for *the* item"—confirming that the "auction" is a single sale, not a multi-sale event.

As the district court recognized, it is a bedrock rule of construction that a term must be interpreted consistently within the same claim. *See* A3 (citing

*Phillips*, 415 F.3d at 1314); *see also Ring Plus*, 614 F.3d at 1364 (rejecting "proposed construction [that] conflicts with" unappealed construction of other terms). Because all of the claims contain the "highest bid in the auction is not from the bidder" limitation, "auction" must take the agreed-upon single-sale meaning throughout each claim.

Walker Digital does not meaningfully dispute the inconsistency between its proposed construction of "auction" and the agreed-upon construction of the "highest bid" limitation. *See* WD Br. 18. In the district court, Walker Digital agreed that it was "construing this term differently" for different limitations but argued "there is nothing inconsistent about" doing so. A902. That argument refuted itself. *See* A3. Walker Digital now argues that the "agreed construction" for the "highest bid" limitation cannot override the meaning of "auction." WD Br. 18. But that gets things backward. As explained above, the meaning of "auction" depends on the context, including the claim language as a whole. Having conceded that the surrounding claim language uses "auction" to refer to a single sale, Walker Digital cannot now argue that the claims are wrong about their own meaning.

Moreover, the reason Walker Digital had to concede that the "highest bidder" limitation uses "auction" to refer to a single sale is that any other construction would cause the claimed method to malfunction. If "auction" referred

23

to an event, the claimed proxy bidder would have to identify the highest bidder for *any* of the lots sold or pending in the *entire event*. If that bidder were the proxy's client, the proxy would make no bid at the predetermined time—even if the client was not the highest bidder for the desired item or lot, but instead had placed the highest bid for a *different* item or lot. Alternatively, if the client had not placed the highest bid thus far in the overall auction event, the proxy bidder would bid at the predetermined time before the end of the event, even if the client was already the highest bidder for the item then being sold, thereby bidding against itself.

Walker Digital's Eric Clapton example again proves the point. Assume that the proxy bidder's client purchased the guitar in Lot 46 for $75,000 and also wants to bid on 15 subsequent lots, all containing less valuable goods. *See* A553–54. Walker Digital's proposed claim construction would prevent the proxy bidder from submitting any bids for those 15 lots because the client would be the "highest bidder" in the entire event based on its purchase of Lot 46. The claimed method would mistakenly presume that the client was bidding against himself or herself when, in fact, the earlier bid had been for a different item.

Conversely, assume that someone other than the client purchased Lot 46 for $75,000, and the client wishes to bid up to $70,000 for a subsequent, less valuable lot. A553. Because the buyer of Lot 46 is the highest bidder in the event under Walker Digital's proposed claim construction, the client's proxy bidder would

repeatedly confirm that its client was not the highest bidder in the event and submit bid after bid against itself until it reached the client's maximum bid of $70,000 for the subsequent lot. The claim's intended *safeguard* against bidding against oneself would *require* it.

Walker Digital has conceded that "[t]he claims have to make sense," A1121, but its proposed claim construction would make nonsense of them. The district court correctly avoided such undesirable and unintended outcomes by construing "auction" to mean a single sale.

### B.  The Specification Confirms That An "Auction" Is A Single Sale.

If further support for the district court's construction were needed, the written description provides it. *See Phillips*, 415 F.3d at 1315. A claim construction should serve the patent's "fundamental object," not undermine it. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008). The stated purpose of the '802 patent is to create a proxy bidder that places bids "in a manner that seems natural and competitive." A66 2:5–6. Walker Digital's construction would put the claimed method at war with this purpose, causing proxies to bid for the wrong items and to bid against themselves—hardly "natural and competitive" results. *See* pp. 18-20, 24-25 *supra*.

Moreover, the reason for those implausible results is that Walker Digital is trying to stretch its patent far beyond anything the applicants invented or disclosed.

The patent sought to solve a problem with multiple-round, eBay-style auctions in which human bidders were instantly outbid by automated proxies. It sought to do so by having proxies bid according to the amount of time left in the auction, not immediately after other bidders. *See* p. 4, *supra.* Neither that problem nor that solution has any applicability to Defendants' single-round, instantaneous auctions with pre-set bid amounts. But Walker Digital is trying to ensnare the accused products by treating numerous different auctions as a single "auction," such that the aggregated auctions would, collectively, involve more than a single round of instantaneous bidding.

The specification's consistent description of the invention refutes that overreaching. As the district court explained, the specification repeatedly "treat[s] each item as a single auction" and "use[s] 'auction' synonymously with 'single sale.'" A3 & n.1. The patent contains no disclosure of how to use the claimed method in a multi-sale auction event.

For example, the specification identifies a list of information necessary to process a bid: "the auction, the bidder and the bid price." A3; *see also* A67 4:62–63. That is consistent with a single-sale auction because no other information is needed when one auction corresponds to one item or lot. In contrast, as the district court explained, the system "would require more information" for a multi-sale event, such as multiple item identifiers, so that the auction manager would know

which items or lots were being sold, in which order, and at which time. A3. Furthermore, when the auction ends, only one selling price is stored in the item database. A74 11:56–58. If there were multiple sales, there would be multiple selling prices.

Moreover, the specification repeatedly associates an auction with "an item" or "the item." *See Ring Plus*, 614 F.3d at 1364; *TiVo Inc. v. Echostar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed Cir. 2008) (holding that "a" and "an" referred, in context, to single item only). For example, "to initialize *an auction*, information about the seller and *the item* to be auctioned is received." A70 9:45–47 (emphases added); *accord id.* 9:30–31. The auction manager stores "information about *the auction*," such as "an identifier of *the item*, start and end dates and times of the auction, a number of bidders, and/or a maximum increment amount for a bid to exceed a previous bid." A68 5:14–22 (emphases added).



Figure 8 (at right) shows a "database of information about *an auction*" that includes start and end times, bid increments, and bidders' details for sale of single "*Item*" identified by "Item Identifier." A57; A66

2:37–38 (emphases added). Further examples abound. *See, e.g.*, A60 (directing bid generator to "associate bidder with auction for *the item*" (emphasis added)); A70 10:19–23 (describing "information about *the auction*, such as *the item* description" (emphases added)).

The specification thereby confirms the clear import of the claim language: that as used in the '802 patent, "auction" refers to a sale, not a multi-sale event. *See, e.g.*, *Ring Plus*, 614 F.3d at 1364; *Trading Techs Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353–54 (Fed. Cir. 2010); *Renishaw*, 158 F.3d at 1251.

## III. WALKER DIGITAL'S LITIGATION-DRIVEN CONSTRUCTION IS UNSUPPORTED.

### A. There Is No Intrinsic Support For Walker Digital's Position.

The intrinsic evidence is so one-sided that Walker Digital admitted in the district court that "there's not" a single example in which the specification discloses the use of the patented method in a multi-sale event. A1116. On appeal, Walker Digital relies on the specification's reference to "goods and services" in the plural and Figure 5's inclusion of a lot with multiple goods. *See* WD Br. 18–19; *see also* A54. As the district court explained, however, "one sale can include multiple goods and/or services." A4. Indeed, the figure on which Walker Digital relies involves just that—the sale of a single item including a karaoke machine and tapes. A54; *see also* A666–67 (listing single-sale, multiple-goods auctions on eBay). Because an auction of a single lot or item consisting of several goods or

28

services is a single sale, this portion of the specification provides no support to Walker Digital.

Walker Digital also emphasizes that the specification states vaguely that there are "many kinds of auctions" that are "held in many different ways." WD Br. 4 (quoting A66–67). But the specification does not even imply that the claimed invention encompasses all of them; instead, as discussed above, it consistently describes the patented invention as involving a single-sale auction, and there are certainly many kinds of single-sale auctions.

Walker Digital nonetheless argues that the specification "expressly defined" the term "auction" to encompass multi-sale events. *Id.* at 5, 15–16. Patent applicants may act as their own lexicographers by clearly stating a "special definition of [a] term" that uses the word "in a manner *other than* [its] ordinary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (emphasis added). Here, however, the specification simply states that "[a]n auction is a public or private sale in which goods or services of a seller may be sold to a bidder through a bidding process." A67 4:46–48; *see also* A539, A543, A547. That passage sheds no light on the question presented here because it merely recites the general dictionary definition discussed above; it does not redefine the term or expresses any preference between the term's ordinary meanings. *See* A4 n.2; pp. 11, 15-16 *supra*. If anything, the specification simply shifts the sale-or-

event ambiguity from the word "auction" to the word "sale," which does nothing to support Walker Digital's position.

Even Walker Digital acknowledges that a definition in the specification controls only when it "explains and defines a term used in the claims, *without ambiguity or incompleteness*." WD Br. 15 (quoting *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1988)) (emphasis added). Reiterating a general dictionary definition certainly does not "'clearly express' an "intent to *redefine* the term" away from its ordinary meaning. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citation omitted). As a result, which ordinary meaning of "auction" applies here depends on the standard claim construction principles discussed above and applied by the district court. *See Ecolab*, 569 F.3d at 1343–44.

To the extent that Walker Digital's complaint is that the district court included clarifying language in its construction by specifying that "[a]n auction consists of one sale," this Court has approved the use of such phrases "clarifying the meaning of claim terms." *Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326, 1333 (Fed. Cir. 2005); *see also Ring Plus*, 614 F.3d at 1364 (construing "allowing" to mean "allow to begin"). Not only are district courts *permitted* to include clarifying language that squarely addresses and resolves the parties' interpretive dispute, they are *required* to resolve such disputes. *See O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008). *Not* including the clarifying language would have been reversible error because it would have left the parties' dispute unresolved.

Even if the specification did expressly define "auction" to refer to multi-sale events, that definition would be trumped by the other intrinsic evidence discussed above. *See Trading Techs.*, 595 F.3d at 1353–54 (narrowing specification's definition of claim term in light of "the claims, the rest of the specification, and the prosecution history"). Especially as narrowed during prosecution to overcome numerous rejections, *see* p. 5, *supra*, the claims are consistent only with the district court's construction of "auction" to mean a single sale.

## B. Prior-Art Uses Of "Auction" Are Either Irrelevant Or Supportive Of The District Court's Construction.

Lacking support in the '802 patent, Walker Digital cites *other*, prior-art patents far more than its own. *See* WD Br. 17–18, 20, 21–23. Two of those patents—Fisher and Alaia—are not even in the district court record and thus are not properly before this Court. *See Phillips*, 415 F.3d at 1317 (prosecution history should be considered "if it is in evidence" (internal quotation marks omitted)). Walker Digital's need to rely on statements in such doubly-extrinsic materials

serves only to underscore the absence of support for Walker Digital's position in the '802 patent and its intrinsic record.[2]

Walker Digital's contentions that certain prior-art references show that the word "auction" can be used to refer to multi-sale auctions, and that the applicants' citation or discussion of those references in the '802 specification or during prosecution shows that they were aware of that usage, WD Br. 21–22, are beside the point. There is no dispute that "auction" *can* refer to a multi-sale event. *See* A1095; A4 n.2. The question is whether it does so here, and it does not for the reasons discussed above. Reliance on prior-art references to contradict the plain import of the asserted patent is improper. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc); *Vitronics*, 90 F.3d at 1584.

Walker Digital's assertion that the examiner's consideration of this prior art shows that the examiner understood the '802 patent to be referring to auction events, WD Br. 22, is baseless. The examiner rejected Walker Digital's claims as anticipated by the prior-art patents on which Walker Digital now relies, *see* A603–06; A633; A636, and later allowed them. But in doing so, the examiner did not construe the term "auction" or rely in any way on whether the claims covered a

---

[2] Defendants did not object to the inclusion of those materials in the Joint Appendix in part to avoid a dispute over the appendix and in part because the patents might be subject to judicial notice. But their contents are irrelevant for the reasons explained in the text.

single- or multi-sale auction; he was silent on that question, and relied instead on the applicants' addition of the "time left in the auction" limitation to the claims. *See* p. 5, *supra.* "Drawing inferences of the meaning of claim terms from an examiner's silence is not a proper basis on which to construe a patent claim . . . ." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326 (Fed. Cir. 2001). Moreover, even assuming *arguendo* that the relevant references disclosed multi-sale auctions, at least some of them also disclosed single-sale auctions. *See, e.g.*, A1004 (discussing "the . . . item for auction"). Thus, whether the claims cover single sales or multi-sale events could not have been relevant to the examiner's rejection and subsequent allowance; the prior art disclosed both.

For whatever it is worth, these prior-art patents also differ significantly from the claimed method, as confirmed by the applicants' amendment of the claims to overcome them. In this Court, Walker Digital relies heavily on the Mori patent. But Mori requires all bids to be entered *before* the auction begins, which is incompatible with the '802 patent's requirement that bids be placed according to the time *remaining* in the auction. *See* A598 15:41–48.

In addition, Mori discloses a *descending*-price approach that is fundamentally different from, and incompatible with, the '802 patent's method of successively *increasing* prices. Take, for example, an auction for 200 boxes of a commodity. The Mori method would begin at an initial price offering and then

33

lower that price until it matched the highest bid. *See* A597 14:3–15:40. That bidder would receive the number of boxes he or she requested at that price, and if additional inventory remained, the price would then be lowered further until it matched bids placed by others. Because the first successful bid in the Mori auction would *always* be the highest bid in the event, every other proxy bidder would bid against itself over and over again until the event ended. *See* pp. 24-25, *supra*. Thus, Walker Digital's reliance on Mori (a patent the applicants *distinguished* during prosecution) only confirms that the '802 patent claims would not function as intended in a multi-sale environment.

The Fisher patent refers to a "twenty-four hour per day seven day per week auction with potentially hundreds or even thousands of individual items and millions of potential bidders." WD Br. 6 (quoting A1004 5:22–27). Why Walker Digital believes this language supports its position is unclear. The claimed method of the '802 patent could not apply to that kind of perpetual auction event because it never ends and therefore has no "amount of time left." In any event, Fisher's actual invention concerns only fixed-time, single-sale auctions. A1004.

Walker Digital also points to the Rupp and Alaia references. Rupp recites a one-time, single-sale method in which bidders bid to provide services based on numerous variables, of which price is only one. A654–55. Similarly, Alaia's method is a single item/single lot, end-timed auction, with the variant that the

34

auction's end time is extended until a certain condition (such as no new bids having been received for a certain number of minutes) is met. A1064–66. Neither patent sheds light on the question presented.

Finally, Walker Digital relies on a draft technical paper apparently written by econometrics researchers at Microsoft that contains a single reference to a "multi-unit auction." A1148. That reference to a "multi-unit auction" is consistent with a single sale of a lot containing multiple goods. *Id.*; *see also* p. 28, *supra*. In any event, that paper—which is not dated, A1147, and is no more than a draft, as shown by the question marks and gaps left at several places in the paper, A1149, A1152, A1154—has nothing to do with the meaning of terms in the '802 patent.

## CONCLUSION

For the reasons set forth above, the Court should affirm the district court's claim construction ruling and the stipulated judgments of non-infringement.

Respectfully submitted on this 21st day of May, 2014.


_/s/ Frank E. Scherkenbach___
FRANK E. SCHERKENBACH
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210-1878

JASON W. WOLFF
RYAN P. O'CONNOR
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130

JOHN A. DRAGSETH
FISH & RICHARDSON P.C.
60 South Sixth Street – Suite 3200
Minneapolis, MN 55402

ISABELLA FU
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052-6399

*Attorneys for Microsoft Corporation*

_/s/ Michael J. Malecek_____
MICHAEL J. MALECEK
TIMOTHY CHAO
KAYE SCHOLER LLP
Two Palo Alto Square, Suite 400
3000 El Camino Real
Palo Alto, CA 94306

DARYL JOSEFFER
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006

ADAM CONRAD
KING & SPALDING LLP
100 N. Tryon St., Suite 3900
Charlotte, NC 28202

*Attorneys for Google Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that the foregoing brief, exclusive of the exempted portions as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), contains 8,277 words and therefore complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i).

 May 21, 2014                                   /s/ Daryl Joseffer
Date                                            Daryl Joseffer

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served the foregoing Brief of Appellees

via the Court's ECF system to each party's counsel.

This 21st day of May, 2014.

 */s/ Daryl Joseffer*　　　　　　

Daryl Joseffer